UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| GREGORY ALEX, Derivatively on Behalf of CAREER EDUCATION CORPORATION, | ) ) ) | Case No. |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| GARY E. MCCULLOUGH, MICHAEL J. GRAHAM, STEVEN H. LESNIK, COLLEEN M. O'SULLIVAN, DENNIS H. CHOOKASZIAN, PATRICK W. GROSS, DAVID W. DEVONSHIRE, LESLIE T. THORNTON, THOMAS B. LALLY, GREGORY L. JACKSON, GEORGE K. GRAYEB, BRIAN R. WILLIAMS, THOMAS A. MCNAMARA, THOMAS G. BUDLONG, and EDWARD A. SNYDER, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| -and- | ) | |
| | ) | |
| CAREER EDUCATION CORPORATION, a Delaware corporation, | ) ) | |
| | ) | |
| Nominal Defendant. | ) ) | |
| | ) | JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this verified shareholder derivative complaint against the defendants named herein.

**SUMMARY OF IMPROPER PRACTICES**

1.      This is a verified shareholder derivative action seeking to remedy harm to Career Education Corporation ("Career Education" or the "Company") committed by certain of its officers and directors. The Individual Defendants (as defined herein) harmed the Company by causing violations of the Securities Exchange Act of 1934 (the "Exchange Act") and applicable state law concerning the recruitment of students, including, but not limited to, disseminating

inflated job placement rates. Further, the practices implemented by the Individual Defendants have caused the Company to come perilously close, if not violate, regulations under Title IV of the Higher Education Act ("HEA"), 20 U.S.C. §1720, *et seq*. ("Title IV"), the source of over 80% of the Company's tuition revenue. Compounding their breaches of fiduciary duty, the Individual Defendants covered their actions by making and having Career Education make improper statements to the public. These violations have cost the Company millions of dollars and subjected it to costly lawsuits, including a securities fraud class action.

2. Career Education operates a number of colleges and universities. These schools receive over 80% of their tuition revenue from Title IV programs. Institutions receiving Title IV funding are required to adhere to certain regulations concerning advertising, promotional practices, and the manner in which prospective students are recruited. In addition, in order to receive Title IV funding, educational institutions must be accredited. To maintain accreditation, schools must place at least 65% of their graduating students in jobs for which their studies prepared them.

3. Defendants consistently misled the public with improper statements about the Company's job placement rates and other "gainful employment" data. Instead of explaining to the public the headwinds Career Education faced due to high unemployment and the struggling economy, defendants designed a number of manipulative means to present inflated placement rates. In so doing, defendants effectively concealed from the public the significant risk to Career Education that many of its schools would lose accreditation and their access to federal aid in deriving revenues due to their inadequate job placement rates.

4. The defendants' improper statements about the Company's compliance with minimum job placement requirements caused Career Education's stock to trade at inflated prices.

Nevertheless, Career Education's Board of Directors (the "Board") caused the Company to repurchase over $252 million of its own stock at artificially inflated prices over three times as high as the Company's share price was worth when the truth about its improper business practices was revealed. At the time the Board authorized these repurchases, defendants represented that initiating a buyback was the best use of the Company's cash on the basis that its stock was undervalued.

5. The defendants' ruse began to unravel on May 19, 2011, when a *New York Times* article mentioned that Career Education was one of five for-profit education companies being investigated by the Attorney General of the State of New York (the "NYAG"). On May 24, 2011, in a Form 8-K filing with the U.S. Securities and Exchange Commission (the "SEC"), Career Education confirmed that it had received a subpoena duces tecum (the "Subpoena") from the NYAG, dated May 17, 2011, in connection with the NYAG's investigation into whether the Company and certain of its schools complied with applicable law.

6. Less than three months later, on August 3, 2011, Career Education announced that it identified improper practices at certain of its Health Education campuses concerning the reporting of job placement rates. It also announced that it hired outside counsel, Dewey & LeBoeuf LLP ("Dewey"), to investigate these acts. The results of Dewey's investigation were staggering. On November 1, 2011, the Company revealed that only thirteen out of forty-nine Health Education and Art and Design segment schools met the 65% job placement threshold.

7. The bad news for the Company continued. On November 14, 2011, Career Education received a letter from the Accrediting Counsel for Independent Colleges and Schools ("ACICS"), the organization that accredited the Company's Health Education and Art and Design segment schools. The letter demanded that Career Education show cause at its December 2011

meeting why these forty-nine institutions should not lose their accreditation. ACICS subsequently expanded this "show cause" directive to all seventy-one Career Education institutions accredited by ACICS.

8.     This "show cause" proceeding found that twenty-four institutions in addition to the thirty-six mentioned above fell below the 65% job placement threshold. Therefore, sixty of seventy-one Career Education institutions accredited by ACICS fell below required standards. These sixty institutions are now subject to an increased level of scrutiny and oversight in order to keep their accreditation.

9.     Further, on June 7, 2012, the Accrediting Commission of Career Schools and Colleges ("ACCSC") sent a letter to the Company. This letter directed the Company to show cause why the ten institutions accredited by the ACCSC should not lose their accreditation.

10.     The Company's hidden improper business practices and inflated job placement rates rendered its contemporaneous public statements concerning its regulatory compliance false and misleading. As the truth about the Company's improper job placement reporting and limited business prospects leaked onto the market, Career Education's value was crushed. Career Education's market capitalization fell from over $1.77 billion to $451 million, a 74% decline. As a result, the Company is now subject to a class action lawsuit for violations of the federal securities law, which has, in part, survived a motion to dismiss.

## THE BOARD IMPROPERLY REFUSES TO ACT IN RESPONSE TO PLAINTIFF'S DEMAND

11.     Amid this onslaught of negative news, on May 15, 2012, plaintiff sent a letter to the Board demanding that it investigate and take action against those that harmed Career Education. Amazingly, in a letter dated June 13, 2012, the Board refused to even investigate the matters raised in plaintiff's demand. Further, the Board said it moved to dismiss a derivative

action alleging similar wrongdoing as the plaintiff's letter for failing to make a demand upon the Board, the very step plaintiff took, yet the Board refused to consider.

12.    On June 29, 2012, plaintiff sent another letter to the Board requesting it reconsider its position.  This letter noted the ACCSC's recent "show cause" letter and that the Company's stock price had recently fallen to its lowest price in a decade.  Plaintiff explained that immediate action was necessary.

13.    Unfortunately, plaintiff was again stone-walled.  In a short, three-paragraph letter dated July 6, 2012, the Board again rejected plaintiff's demand.

14.    Then, on September 17, 2012, counsel for the Board sent plaintiff recent filings from the derivative action that the Board previously used to justify not considering plaintiff's demand.  The filings contained resolutions the Board passed concerning the formation of a Special Litigation Committee ("SLC").  The September 17th letter stated that the Board created the SLC "specifically to investigate the issues raised in [plaintiff's] Demand Letter."  The Board resolutions, however, made absolutely no mention of plaintiff's demand.  Instead, they were directed completely at the pending derivative action.  Thus, this most recent letter is just another way the Board attempts to justify its refusal to even consider plaintiff's demand.  Such a refusal cannot be the product of a fully informed decision, and accordingly, is not protected by the business judgment rule.

15.    Due to the Board's refusal to act, plaintiff now brings this action to correct the harm the Individual Defendants caused the Company.

**JURISDICTION AND VENUE**

16.    This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act.  This

Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

17.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) the Company is headquartered in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein had an impact on this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

19.     Plaintiff Gregory Alex was a shareholder of Career Education at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Career Education shareholder.

**Nominal Defendant**

20.     Nominal Defendant Career Education is a Delaware corporation with principal executive offices located at 231 N. Martingale Road, Schaumburg, Illinois.  Career Education is a for-profit education company serving approximately 100,000 students, on more than ninety

campuses throughout the United States, United Kingdom, France, and Monaco. Career Education's purportedly career-focused educational services offer doctoral, master's, bachelor's, and associate degrees, and other diploma and certificate programs. The Company's business and services are divided into six segments: the Colorado Technical University and American InterContinental University ("AIU") segments offer programs in business studies, information technologies, criminal justice, computer science, engineering, and health sciences; the Health Education segment offers curricula specifically targeted toward careers in the health field; the Culinary Arts segment includes the Le Cordon Bleu schools and focuses on culinary arts and hotel and restaurant management; the Art and Design segment institutions focus on fashion, game, graphic, and interior design, film and video production, photography, and visual communications; and the International segment includes all Career Education institutions located outside of the United States, which offer career-oriented disciplines in business studies, health education, advertising, communications, technologies, and luxury goods and services.

**Defendants**

21. Defendant Gary E. McCullough ("McCullough") was Career Education's Chief Executive Officer ("CEO"), President, and a director from March 2007 to October 2011. Defendant McCullough is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant McCullough knowingly, recklessly, or with gross negligence: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; (iii) made improper representations regarding graduating students' job placements rates; (iv) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the

Company's disclosures; and (v) caused Career Education to repurchase Company shares, and failed to halt the repurchases of shares, while Career Education's share price was artificially inflated as a result of improper statements regarding Career Education's business prospects. Career Education paid defendant McCullough the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|---------------|----------------------------------------|------------------------|-------|
| 2011 | $722,488 | $3,720,070 | $1,642,378 | - | $3,672,844 | $9,757,780 |
| 2010 | $822,544 | $1,283,061 | $1,629,036 | $828,200 | $14,082 | $4,576,923 |
| 2009 | $802,070 | $1,039,996 | $1,452,601 | $1,600,000 | $29,124 | $4,923,791 |

Additionally, upon defendant McCullough's resignation from the Company, he entered into an agreement with the Company under which he was entitled to all the rights and benefits under his employment agreement, for a total benefit of $5,449,555.

22.    Defendant Michael J. Graham ("Graham") was Career Education's Executive Vice President and Chief Financial Officer ("CFO") from September 2007 to August 2012. Defendant Graham was also Career Education's Treasurer from September 2007 to November 2007 and again from at least July 2012 to August 2012. Defendant Graham is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Graham knowingly, recklessly, or with gross negligence: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; (iii) made improper representations regarding graduating students' job placements rates; and (iv) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures. Career Education paid defendant Graham the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2011 | $444,898 | $1,406,730 | $422,502 | $142,884 | $18,373 | $2,435,387 |
| 2010 | $439,139 | $373,400 | $474,039 | $330,586 | $16,063 | $1,633,227 |
| 2009 | $418,162 | $288,754 | $403,307 | $626,250 | $14,842 | $1,751,315 |

23.      Defendant Steven H. Lesnik ("Lesnik") is Career Education's current CEO and President and has been since October 2011; Chairman of the Board and has been since March 2008; and a director and has been since February 2006.    Defendant Lesnik knowingly, recklessly, or with gross negligence: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; (iii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures, including, but not limited to, representations regarding graduating students' job placements rates; and (iv) caused Career Education to repurchase Company shares, and failed to halt the repurchases of shares, while Career Education's share price was artificially inflated as a result of improper statements regarding Career Education's business prospects.    Additionally, defendant Lesnik refused plaintiff's demand in bad faith.    Career Education paid defendant Lesnik the following compensation as an executive:

| Year | Salary | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $166,667 | $213,920 | $124,000 | $504,587 |

And as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2010 | $134,731 | $450,960 | $585,691 |
| 2009 | $114,000 | $327,360 | $441,360 |

24.      Defendant Colleen M. O'Sullivan ("O'Sullivan") is Career Education's current CFO and Treasurer and has been since August 2012, and a Senior Vice President and has been

since July 2008. Defendant O'Sullivan was also Career Education's Chief Accounting Officer from July 2008 to August 2012, and Vice President and Corporate Controller from January 2008 to July 2008. Defendant O'Sullivan knowingly, recklessly, or with gross negligence: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; and (iii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures, including, but not limited to, representations regarding graduating students' job placements rates.

25.    Defendant Dennis H. Chookaszian ("Chookaszian") is a Career Education director and has been since October 2002. Defendant Chookaszian is also Chairman of Career Education's Audit Committee and has been since at least April 2008. Defendant Chookaszian acted as a controlling person of Career Education within the meaning of section 20(a) of the Exchange Act as alleged herein. Based on the Company's own Audit Committee Charter, defendant Chookaszian had direct or supervisory authority regarding the Company's SEC filings and the Company's other public communications concerning its general business, results, financial condition, and prospects. Defendant Chookaszian knowingly or recklessly: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; (iii) reviewed and approved improper representations regarding graduating students' job placements rates; (iv) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (v) caused Career Education to repurchase Company shares, and failed to halt the repurchases of shares, while Career Education's share price was artificially inflated as a result of improper statements

regarding Career Education's business prospects. Additionally, defendant Chookaszian refused plaintiff's demand in bad faith. Career Education paid defendant Chookaszian the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $70,500 | $213,920 | $284,420 |
| 2010 | $51,000 | $450,960 | $501,960 |
| 2009 | $46,000 | $327,360 | $373,360 |

26. Defendant Patrick W. Gross ("Gross") is a Career Education director and has been since December 2005. Defendant Gross is also a member of Career Education's Audit and Compensation Committees and has been since at least April 2008. Defendant Gross acted as a controlling person of Career Education within the meaning of section 20(a) of the Exchange Act as alleged herein. Based on the Company's own Audit Committee Charter, defendant Gross had direct or supervisory authority regarding the Company's SEC filings and the Company's other public communications concerning its general business, results, financial condition, and prospects. Defendant Gross knowingly or recklessly: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; (iii) reviewed and approved improper representations regarding graduating students' job placements rates; (iv) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (v) caused Career Education to repurchase Company shares, and failed to halt the repurchases of shares, while Career Education's share price was artificially inflated as a result of improper statements regarding Career Education's business prospects. Additionally, defendant Gross refused plaintiff's demand in bad faith. Career Education paid defendant Gross the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $71,000 | $213,920 | $284,920 |
| 2010 | $51,500 | $450,960 | $502,460 |
| 2009 | $59,500 | $327,360 | $386,860 |

27.    Defendant David W. Devonshire ("Devonshire") is a Career Education director and has been since March 2008.  Defendant Devonshire is also a member of Career Education's Audit and Compensation Committee and has been since at least at least April 2009.  Defendant Devonshire acted as a controlling person of Career Education within the meaning of section 20(a) of the Exchange Act as alleged herein.  Based on the Company's own Audit Committee Charter, defendant Devonshire had direct or supervisory authority regarding the Company's SEC filings and the Company's other public communications concerning its general business, results, financial condition, and prospects.  Defendant Devonshire knowingly or recklessly: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; (iii) reviewed and approved improper representations regarding graduating students' job placements rates; (iv) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (v) caused Career Education to repurchase Company shares, and failed to halt the repurchases of shares, while Career Education's share price was artificially inflated as a result of improper statements regarding Career Education's business prospects.  Additionally, defendant Devonshire refused plaintiff's demand in bad faith.  Career Education paid defendant Devonshire the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $57,000 | $213,920 | $270,920 |
| 2010 | $43,000 | $450,960 | $493,960 |
| 2009 | $47,000 | $327,360 | $374,360 |

28.    Defendant Leslie T. Thornton ("Thornton") is Career Education's Lead Independent Director and has been since October 2011 and a director and has been since December 2005.  Defendant Thornton knowingly or recklessly: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; (iii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures, including, but not limited to, representations regarding graduating students' job placements rates; and (iv) caused Career Education to repurchase Company shares, and failed to halt the repurchases of shares, while Career Education's share price was artificially inflated as a result of improper statements regarding Career Education's business prospects.  Additionally, defendant Thornton refused plaintiff's demand in bad faith.  Career Education paid defendant Thornton the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $71,833 | $213,920 | $285,753 |
| 2010 | $48,000 | $450,960 | $498,960 |
| 2009 | $42,000 | $327,360 | $369,360 |

29.    Defendant Thomas B. Lally ("Lally") is a Career Education director and has been since January 1998.  Defendant Lally is also a member of Career Education's Compensation Committee and has been since at least at least April 2008.  Defendant Lally knowingly or recklessly: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; (iii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures, including, but not limited to, representations regarding graduating students' job placements rates; and (iv)

caused Career Education to repurchase Company shares, and failed to halt the repurchases of shares, while Career Education's share price was artificially inflated as a result of improper statements regarding Career Education's business prospects. Additionally, defendant Lally refused plaintiff's demand in bad faith. Career Education paid defendant Lally the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $67,000 | $213,920 | $280,920 |
| 2010 | $43,500 | $450,960 | $494,460 |
| 2009 | $48,000 | $327,360 | $375,360 |

30. Defendant Gregory L. Jackson ("Jackson") is a Career Education director and has been since November 2008. Defendant Jackson is also a member of Career Education's Compensation Committee and has been since at least at least April 2009. Defendant Jackson knowingly or recklessly: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; (iii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures, including, but not limited to, representations regarding graduating students' job placements rates; and (iv) caused Career Education to repurchase Company shares, and failed to halt the repurchases of shares, while Career Education's share price was artificially inflated as a result of improper statements regarding Career Education's business prospects. Additionally, defendant Jackson refused plaintiff's demand in bad faith. Career Education paid defendant Jackson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $59,500 | $213,920 | $273,420 |
| 2010 | $44,500 | $450,960 | $495,460 |
| 2009 | $46,000 | $327,360 | $373,360 |

31.     Defendant George K. Grayeb ("Grayeb") was Career Education's Senior Vice President – Health Strategic Business Unit from March 2008 to March 2011.  Defendant Grayeb was also Vice President and Managing Director of Career Education's Health Division from September 2006 to March 2008 and Vice President and Managing Director of the Health East Division from January 2005 to September 2006.  Defendant Grayeb knowingly, recklessly, or with gross negligence: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; and (iii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures, including, but not limited to, representations regarding graduating students' job placements rates.  Career Education paid defendant Grayeb the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2010 | $323,560 | $251,603 | $319,430 | $234,946 | $15,767 | $1,145,306 |
| 2009 | $307,546 | $207,202 | $289,398 | $307,083 | $10,345 | $1,121,574 |

32.     Defendant Brian R. Williams ("Williams") was Career Education's Senior Vice President Culinary Arts from September 2008 to the fourth quarter of 2011 and Vice President of Operations for Culinary Arts from February 2008 to September 2008.  Defendant Williams was also Vice President of Admissions for Career Education's AIU Online from 2006 to 2008; Special Assistant to the AIU CEO from 2005 to 2006; President of Western Culinary Institute from 2003 to 2005; Regional Vice President of the College Division West in 2003; Vice President and Managing Director for AIU from 2000 to 2003; Vice President of the College Division from 1999 to 2000; and President of Career Education's Scottsdale Culinary Institute in 1999.  Defendant Williams knowingly, recklessly, or with gross negligence: (i) caused the

Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; and (iii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures, including, but not limited to, representations regarding graduating students' job placements rates.

33.     Defendant Thomas A. McNamara ("McNamara") was Career Education's Senior Vice President Art and Design from November 2010 to the fourth quarter of 2011.  Defendant McNamara was also Senior Vice President at Career Education's Chicago-based International Academy of Design and Technology ("IADT") from January 2009 to October 2010; Vice President of Operations for IADT from March 2008 to January 2009; Vice President and Managing Director of Career Education's Start-up Division from October 2005 to March 2008; Vice President of Operations for the Start-up Division from January 2005 to October 2005; and Vice President of Finance for the Start-up Division from January 2004 to January 2005. Defendant McNamara joined the Company in February 2001 as Controller and Director of Operations for IADT.  Defendant McNamara knowingly, recklessly, or with gross negligence: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; and (iii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures, including, but not limited to, representations regarding graduating students' job placements rates.

34.     Defendant Thomas G. Budlong ("Budlong") was Career Education's Senior Vice President, Chief Administrative Officer, and Chief of Staff from November 2010 to the fourth quarter of 2011.  Defendant Budlong was also Career Education's Senior Vice President, Head of

International Operations and Chief Administrative Officer from January 2009 to November 2010 and Senior Vice President, Organizational Effectiveness and Administration from August 2007 to January 2009. Defendant Budlong knowingly, recklessly, or with gross negligence: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; and (iii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures, including, but not limited to, representations regarding graduating students' job placements rates. Career Education paid defendant Budlong the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2011 | $291,363 | $417,586 | $246,244 | - | $475,177 | $1,430,370 |
| 2010 | $345,266 | $234,366 | $297,544 | $172,944 | $17,227 | $1,067,347 |
| 2009 | $334,679 | $196,010 | $273,759 | $328,750 | $13,575 | $1,146,773 |

35. Defendant Edward A. Snyder ("Snyder") was a Career Education director from March 2008 to May 2011. Defendant Snyder was also a member of Career Education's Audit Committee from at least April 2009 to at least April 2011. Defendant Snyder acted as a controlling person of Career Education within the meaning of section 20(a) of the Exchange Act as alleged herein. Based on the Company's own Audit Committee Charter, defendant Snyder had direct or supervisory authority regarding the Company's SEC filings and the Company's other public communications concerning its general business, results, financial condition, and prospects. Defendant Snyder knowingly or recklessly: (i) caused the Company to engage in improper recruiting practices; (ii) implemented and maintained an unsustainable business model that has jeopardized the Company's ability to remain eligible for Title IV funding; (iii) reviewed and approved improper representations regarding graduating students' job placements rates; (iv)

caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (v) caused Career Education to repurchase Company shares, and failed to halt the repurchases of shares, while Career Education's share price was artificially inflated as a result of improper statements regarding Career Education's business prospects. Career Education paid defendant Snyder the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $16,419 | - | $16,419 |
| 2010 | $39,500 | $450,960 | $490,460 |
| 2009 | $36,500 | $327,360 | $363,860 |

36.     The defendants identified in ¶¶21-24, 31-34 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶21, 23, 25-30, 35 are referred to herein as the "Director Defendants." The defendants identified in ¶¶25-27, 35 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶26-27, 29-30 are referred to herein as the "Compensation Committee Defendants." Collectively, the defendants identified in ¶¶21-35 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

37.     By reason of their positions as officers, directors, and/or fiduciaries of Career Education and because of their ability to control the business and corporate affairs of Career Education, the Individual Defendants owed and owe Career Education and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Career Education in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Career Education and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

38.     Each officer and director of the Company owes to Career Education and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Additional Duties of the Audit Committee Defendants**

39.     In addition to these duties, under the Board's Audit Committee's Charter adopted in January 2008 and updated in January 2011, defendants Chookaszian, Devonshire, Gross, and Snyder, as members of the Audit Committee, owe and/or owed specific duties to Career Education.  The Audit Committee is/was responsible for overseeing the Company's compliance with "applicable legal or regulatory requirements."  In particular, the Audit Committee is responsible for reviewing "significant risks or exposures facing the Company; assess the steps management has taken, or proposes to take, to minimize such risks; review management's progress regarding such steps; and periodically review the Company's policies for assessing and managing risk."  In addition, the Audit Committee is/was also tasked with reviewing "significant financial reports to be released to the public, or filed with the SEC, prior to such distribution or filing."  Furthermore, the Audit Committee is required to review "the Company's earnings releases prior to their dissemination."  Defendants Chookaszian, Devonshire, and Gross were classified by the Board as "audit committee financial experts" as the term is defined in the SEC's

rules and regulations. The Audit Committee met eight times in 2008, seven times in 2009, and nine times in both 2010 and 2011.

**Additional Duties of the Compensation Committee Defendants**

40.     In addition to these duties, under the Company's Compensation Committee Charter in effect since at least October 2008, the members of the Compensation Committee, defendants Devonshire, Gross, Jackson, and Lally, had direct and supervisory authority over the Company's compensation of Career Education's executive officers. In particular, according to the Compensation Committee Charter, the Compensation Committee defendants were responsible for "recommend[ing] to the Company's [Board] guidelines and standards relating to the determination of executive compensation" and "review[ing] the Company's executive compensation policies." In order to assess the Company's management, the Compensation Committee needed to "review and approve goals and objectives relevant to such compensation (both internal and in comparison to industry performance levels) and evaluate the CEO's performance in light of those goals and objectives, with a view toward encouraging extraordinary effort and performance." The Compensation Committee was active during the wrongdoing alleged herein, meeting fifteen times in 2008, eighteen times in 2009, eleven times in 2010, and eight times in 2011. During these years, the Compensation Committee shaped the path of the Company by incentivizing certain improper behavior of the executives by encouraging short term goals and objectives in a way that was detrimental to the Company in the long term. In particular, defendants Devonshire, Gross, Jackson, and Lally tied executive compensation primarily to earnings, as opposed to criteria measuring student success. This was especially troublesome given that the Company received over 80% of its revenue from Title IV programs, the same government programs that defendants violated with their manipulative recruiting

practices and false and misleading job placement reporting. But for the executive officers artificially inflating job placement rates for Career Education to remain in good standing with college accreditors and continue to be eligible for federal aid dollars, they would not collect on their massive executive compensation plans.

**Control, Access, and Authority**

41.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Career Education, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

42.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Career Education, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

43.     To discharge their duties, the officers and directors of Career Education were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Career Education were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements

about the Company's financial health;

      (d)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

      (e)    remain informed as to how Career Education conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable regulations and the federal securities laws.

**Breach of Duties**

44.    Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Career Education, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of Career Education's Board.

45.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to violate applicable

federal and state laws and regulations. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of the defendants' illegal actions and course of conduct, Career Education is now the subject of numerous government investigations, multiple lawsuits filed on behalf of students misled by the Company's improper recruiting practices, and a securities class action lawsuit. Recently, the Honorable Matthew F. Kennelly (N.D. Ill.) denied the defendants' motion to dismiss the securities class action, substantially increasing the costs to the Company of the lawsuit, since it is now engaged in discovery, and increasing the likelihood that Career Education will have to make a considerable payment to investors that purchased Company stock at inflated prices. Thus, Career Education has expended, and will continue to expend, significant sums of money.

## SUBSTANTIVE ALLEGATIONS

**Regulations Under Title IV**

46. The for-profit education sector is a multi-billion dollar business with most of its revenues guaranteed by loans its students receive from the federal government. The for-profit education sector – including Career Education – is currently under severe scrutiny for deceiving investors, the federal government, and its students about its business operations, including, among other things, its fraudulent recruitment tactics and its dismal student loan repayment rates.

47. Most of the current scrutiny concerns for-profit schools' compliance with the HEA. The HEA was passed "to strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." It increased federal money given to universities, created scholarships, and gave low-interest loans for students.

48.     Title IV of the HEA concerns financial assistance for students.  The purpose of Title IV was "to assist in making available the benefits of postsecondary education to eligible students … in institutions of higher education."  One way Title IV achieves its stated purpose is by providing grants and loans to low-income students in order to allow them to attend institutions of higher education.  However, there are strict regulations that for-profit institutions, like Career Education's schools, must comply with in order for their programs to be eligible to receive Title IV funding.

49.     The U.S. Department of Education (the "Department") specifies extensive criteria which an institution must meet in order to participate in Title IV programs.  The Company's schools and universities must comply with specific standards and procedures set forth in the HEA and the regulations issued thereunder by the Department.  In general, an institution must, among other things, be authorized by each state within which it is physically located to offer its educational programs and maintain institutional accreditation by a recognized accrediting agency.  The institution also must be certified by the Department to participate in Title IV programs based on a determination that the institution meets certain standards of administrative capability and financial responsibility.

50.     According to the Company's Form 10-K filed with the SEC on February 22, 2011, as of December 31, 2010, approximately 18% of Career Education's U.S. schools' cash receipts from tuition payments, in the aggregate, were derived from non-Title IV sources.  Therefore, 82% of Career Education's U.S. cash tuition receipts were derived from Title IV sources.

51.     Because the vast majority of Career Education's revenues is derived from Title IV programs, the Individual Defendants knew that it would be devastating for the Company and its

shareholders if the Company were to lose a substantial amount of Title IV funding.  As the February 22, 2011 Form 10-K notes:

> If any one of our campuses were to lose state authorization, it would be unable to offer educational programs, and students attending the campus would not be eligible to participate in Title IV Programs, and *the lack of Title IV eligibility would likely require us to close a campus* if it were to lose state authorization.
>
> \*   \*   \*
>
> *Any loss of institutional accreditation would result in a loss of Title IV Program funds for the affected school and its students.*

**Career Education's History of Fraud, Deception, and Non-Compliance with Applicable Regulations**

52.     Prior to the wrongdoing alleged herein, Career Education faced a number of lawsuits accusing the Company of misleading its students and regulators about job placement rates, starting salaries, the quality of its teaching staff and training equipment, the transferability of its course credits, and the accreditation of certain of its programs.  For example, in November 2003, Career Education was sued by a former Director of Career Services at Gibbs College, in New Jersey, who claimed that students who had not completed required courses or internships were allowed to graduate, and that students were being presented to potential employers as good candidates even though they had not completed the required coursework or had received failing grades.

53.     In December 2003, Cam Van Wingerden, a former registrar of Career Education's Brooks Institute of Photography in Santa Barbara, California, filed a complaint with ACICS accusing the Company of tampering with student records to ensure that Career Education's then-new Ventura campus could pass inspections by accreditors.  Ms. Van Wingerden alleged, among other things, that Career Education's management had asked staff members "to commit forgery,

fraud, perjury or whatever else is necessary to [permit the school] to pass [accreditation] audit inspections."

54.     In response to the disclosure of Cam Van Windergen's complaint, Career Education's stock dropped 28%, wiping out more than $1.5 billion in market capitalization. Commenting on the dramatic stock drop, Barrington Research Associates' Director of Research Alexander Paris, Jr. pointedly noted, "The issue here, and the reason why we're seeing such a response, is that this isn't the first time [Career Education had been accused on wrongdoing]. Now that this comes out ... [it] is sort of too much for certain people to handle."

55.     Cam Van Wingerden's complaint trigged an investigation by the California Bureau for Private Postsecondary Education (the "Bureau"), a division of California's Department of Consumer Affairs.  The Bureau, following an undercover investigation, found that Brooks engaged in "a pervasive pattern of misrepresentation" by routinely inflating claims of its graduates' success in order to draw new students.  In response to an inquiry from the Bureau, one Brooks graduate stated that "any job was counted as a placement, even if it had nothing to do with photography." The Bureau found the conduct at Brooks so egregious that it threatened to deny the Company the right to continue operating in California if it did not address nine concerns detailed in a blistering report issued in November 2004.  In addition to making restitution to students, the Bureau's report said that Brooks should stop enrolling students until it tracked down and verified job placement information for each 2003 graduate to counter claims of inflated career placements, that Brooks should be required to inform every prospective student in writing that it "was found to be in violation of the statutes and regulations" governing education in California, and that the Bureau had determined that "it [was] not in the public interest" to issue Brooks an unconditional permit to operate.

56.     The falsification of records at Career Education schools was common knowledge to the Company's then-Board and executive management.  During a meeting held in 2003, for example, the Company's Audit Committee discussed Cam Van Wingerden's calls to the Board regarding the widespread falsification of records concerning student enrollment, retention, and graduation at Brooks.  An internal investigation confirmed the allegations of student record falsification.

57.     The wrongdoing at Brooks was also included in a "60 Minutes" exposé of deceptive practices at for-profit schools in 2005, which caused a significant reputational hit to the Company.  Throughout 2004 and 2005, several derivative lawsuits were filed in connection with the Brooks allegations, which culminated in a decision in December 2008 to close Brooks down.

58.     In 2004, Career Education was sued for securities fraud in the United States District Court for the Northern District of Illinois (the "2004 Securities Fraud Action").  In the 2004 Securities Fraud Action, Career Education was accused, among other things, of "regularly falsifying student records in order to increase graduation rates and enrollment, and conceal problems that could have threatened the accreditation of its schools."  In the 2004 Securities Fraud Action, a former Career Education Employee Relations Manager who was interviewed by counsel for plaintiffs accused Career Education of achieving its touted 98% placement rate for graduating students by resorting to "loopholes."  For example, if a student had been in the military while he was enrolled in a Career Education program, Career Education would consider his ongoing military service following graduation as a job placement.  In addition, a graduate who enrolled in a new Career Education program was also counted as placed.  After years of litigation, Career Education paid $4.9 million to settle these allegations.

59.     In December 2005, the Commission on Colleges of the Southern Association of Colleges and Schools (the "Commission") placed all of the Company's AIU campuses on probation for "failure to correct deficiencies of significant non-compliance."  A year later, the Commission extended the probation for another twelve months.  In a scathing January 2007 report, the Commission determined, among other things, that AIU:

- Had fundamental issues with "integrity in all operations."

- Failed to offer degree programs that "embody a coherent course of study and are compatible with the institution's purpose."

- Did not have an adequate number of full-time faculty or qualified administrative and academic officers.

- Lacked "institutional effectiveness."

60.     Moreover, in its Form 10-K for the fiscal year ended December 31, 2007, filed with the SEC on February 28, 2008, Career Education disclosed that it had agreed to pay a total of $12.4 million to settle three actions (namely, *Thurston, et al. v. Brooks College, Ltd., et al.*; *Nilsen v. Brooks Institute of Photography, et al.*; *Outten, et al. v. American InterContinental University, Inc.*), which had alleged that Brooks College, Brooks Institute of Photography, and AIU, respectively, violated the California Business and Professions Code and Consumer Legal Remedies Act by misleading potential students regarding, among other things, placement statistics.

61.     On June 23, 2008, a class action was filed in state court in California alleging that Career Education's California School of Culinary Arts ("CSCA") lured prospective students via, among other things, falsified placement rates (*Vasquez, et al. v. California School of Culinary Arts, Inc. and Career Education Corporation*, Case No. BC393129 (Cal. Super. Ct., Los Angeles

County)).  The *Vasquez* complaint alleges that CSCA represented to prospective students that CSCA had job placement rates in the 80%-90% range but failed to disclose "that these 'placements' [were] defined by CSCA as any individual who obtained a position in the food services industry or a related position. Thus, a graduate who obtained a position as a barista at Starbucks, or an $8 an hour prep cook, or operated a hot dog stand, would be considered to have been 'placed' for purposes of these statistics."

62.     Later, on November 3, 2010, Career Education reported that it had agreed to pay $40.8 million to settle lawsuits filed by students from certain of Career Education's culinary schools who alleged that Career Education had published falsified placement rates to induce students to enroll at its California Culinary Academy ("CCA").  The operative complaint in one of these actions – namely, *Amador, et. al. v. California Culinary Academy, Inc., and Career Education Corporation*, Case No. CGC-07-467710 (Cal. Super. Ct., San Francisco County Sept. 28, 2007)) – details a fraudulent scheme to induce students to enroll in CCA via falsified placement rates.  For example, *Amador* plaintiff Matt Foist alleged that the 97% placement rate he relied upon in deciding to enroll in CCA was a "lie" because:

> [W]hen Defendants calculated that rate, they included placements that could not legally be counted under the [California Private Postsecondary and Vocational Education Reform Act of 1989] because they were not jobs to which CCA training was represented to lead. In addition, neither the catalog nor the addendum disclosed: (1) that the placement statistics included nonprofessional entry level jobs like prep cooks, $8-$12 an hour line cooks, and Starbucks baristas; (2) that a culinary degree was not a pre-requisite or even relevant for many of the included jobs; (3) that the wages paid to the substantial majority of graduates included in the placement statistics were $12/hour or less; (4) that while years of experience might qualify someone for a Chef job, a CCA degree would not; and (5) that a very small percentage of CCA culinary arts graduates would ever become Chefs.

63.     The improper practices at Career Education also caught the attention of regulators.  In June 2005, the Department informed Career Education that, pending program reviews at several Career Education schools, it would not approve any new school acquisitions

or applications for additional branch campuses of existing Career Education institutions. Citing "a history of non-compliance" with government financial standards and misrepresentations about the employment rates of its graduates, Career Education was essentially banned from expansion – a ban that remained in effect until January 2007. This ban crippled Career Education's performance and growth prospects during this time period.

64.     In 2005, Career Education was investigated by the SEC for various non-compliance issues, including allegations that student records had been falsified at certain of its institutions to maintain access to Title IV funding. Early in 2006, the Department forced Career Education to return nearly $500,000 in federal financial student aid to the federal government to resolve claims that some of its students were not eligible for Title IV government loans.

65.     Later that same year, in May 2006, the Company was advised of a civil investigation, launched again by the DOJ, into allegations that certain the Company's schools may have submitted false claims or statements to the Department.

66.     Stock analysts regularly punished Career Education's stock for the repeated compliance failures and the apparent recidivism of Career Education's management. Indeed, most analysts echoed the sentiments of Matthew Litfin, an analyst at William Blair & Company, L.L.C. in Chicago, Illinois, who in a November 7, 2005 research note, recommended against buying Career Education shares in part because of the "potential outcome of current and future regulatory matters" that regularly dogged the Company.

**The Increased Scrutiny by the Government into For-Profit Schools**

67.     While defendants were causing Career Education to consistently tout its "culture of compliance" with applicable regulations, government and regulatory investigations into the for-profit education sector intensified. In June 2010, the U.S. Senate's Health, Education, Labor

and Pensions ("HELP") Committee commenced an investigation regarding the federal government's investment in for-profit institutions of higher education. During the first HELP Committee hearing on June 24, 2010, the Committee chairman, Senator Tom Harkin of Iowa, commented that "[t]here are growing questions about whether all students – and taxpayers by extension – are receiving value for their educational dollar" at for-profit institutions.

68.     In conjunction with the June 24, 2010 hearing, the HELP Committee issued a report entitled "Emerging Risk?:   An Overview of Growth, Spending, Student Debt and Unanswered Questions in For-Profit Higher Education," calling for increased oversight of the for-profit education industry, where "schools charge higher tuition than comparable public schools, spend a large share of revenues on expenses unrelated to teaching, experience high dropout rates, and, in some cases, employ abusive recruiting and debt-management practices." During the June 24, 2010 hearing, Senator Harkin outlined some of the HELP Committee report's key findings, including that: (i) a whopping 98% of these institutions' students borrowed money to pay their tuition (compared to 38% of community college students); (ii) for-profit students are eight times more likely than community college students to graduate with student loan debt exceeding $20,000; and (iii) for-profit college students are more likely to default on their loans than their peers at non-profit schools.

69.     The HELP Committee also heard testimony on June 24, 2010, from the Department Inspector General, who disclosed that her office's investigations had identified several types of fraud involving for-profit institutions, including miscalculation and manipulation of numbers to create the illusion of compliance. Additionally, the HELP Committee heard from a former Career Education student, Yasmine Issa, who testified that attending a career college (Career Education's Sanford-Brown Institute) had left her unable to find a job in her field and

saddled with debt. Ms. Issa stated that she was steered into an accelerated program that purportedly would help her earn an ultrasound certificate in just eighteen months at a cost of $27,000, and testified that she was promised that Sanford-Brown's placement service would guide her into a well-paying job. After taking on substantial loans and completing the program, however, Ms. Issa learned that although Sanford-Brown was accredited, the program in which she enrolled was not.

70. During the HELP Committee's June 24, 2010 hearings, Senator Harkin expressed grave concerns about whether these Title IV dollars were being spent wisely, particularly given the lack of transparency regarding student graduation, withdrawal and job placement rates, and the evidence of "huge student turnover" at for-profit institutions.

71. On August 4, 2010, the HELP Committee conducted another hearing. In connection with that hearing, the Government Accountability Office ("GAO") issued a report ("GAO Report"), which was leaked to the press. The GAO Report outlined the results of its undercover investigation into the student recruitment practices at fifteen for-profit universities. The report indicated that personnel at all fifteen schools had made "deceptive and questionable" statements to investigators, while four of them had actively encouraged the prospective students to commit fraud when applying for financial aid. Although none of the schools mentioned in the GAO Report were owned by Career Education, the GAO Report and the ensuing fallout caused investors to focus even more heavily on the potential regulatory risks facing the Company.

72. On August 13, 2010, the Department released data on estimated student loan repayment rates, which demonstrated the for-profit sector to be broadly underperforming its peers in non-profit education. Put simply, graduates of for-profit schools were not getting

meaningful jobs in sufficient numbers to repay the massive student loan debts that they incurred to enroll in for-profit educational programs.

73.     As a result of the HELP Committee hearings and calls for reform by the U.S. Government, the Department proposed new "gainful employment" rules, under which for-profit educational providers will fully qualify for federal aid only if either: (i) more than 45% of their former students are paying off principal on loans; or (ii) the debt burden of former students is below 8% of their total income or below 20% of their discretionary income.  Accordingly, schools will be eligible for federal loans only if they prepare their student for "gainful employment in a recognized occupation" under the HEA.  Schools whose repayment rates are below 35% or whose students' debt burden is above 12% of total income and 30% of discretionary income will lose their eligibility for federal loans.

74.     These regulations were designed to ramp up over a three-year period, giving colleges time to reform while protecting students and their families from exploitative programs. "These new regulations will help ensure that students at these schools are getting what they pay for: solid preparation for a good job," Secretary of Education Arne Duncan said when announcing the new regulation. "We're giving career colleges every opportunity to reform themselves but we're not letting them off the hook, because too many vulnerable students are being hurt."  The new regulations, once adopted, were viewed as a significant regulatory victory for the for-profit sector in general, and for Career Education in particular, because, among other things, companies like Career Education had extensive time to identify and fix any problems needed to comply with the expected regulations.

**Defendants' Manipulative Recruitment Practices**

75.     Despite the government's increased scrutiny into the for-profit education industry, defendants caused the Company to continue its deceptive recruiting practices.  In particular, defendants reported inaccurate employment statistics following graduation in order: (i) to encourage students to apply to the Company's schools; and (ii) for the Company's schools to remain in good standing with college accreditors and continue to be eligible for federal aid dollars.

76.     As explained above, to maintain accreditation, schools must place at least 65% of their graduating students in jobs for which their studies prepared them.  Defendants were able to report high placement rates and meet minimum placement requirements through an improper course of conduct and a manipulative use of the term "employment."  A large number of the Company's reported placement figures lacked sufficient supporting documentation.  An even larger portion of the Company's placement figures were false and misleading because they included jobs that did not require and/or had nothing to do with the Company's educational programs.  As such, these jobs should not have been included in the Company's reported placement figures.

77.     Because of its poor compliance history and the more recent scrutiny of Career Education in the wake of the HELP Committee investigations, the GAO Report, and numerous lawsuits on behalf of students misled by the Company's recruitment practices in the past, defendants should have been particularly vigilant in monitoring and overseeing the Company's schools' operations, and in particular, their regulatory compliance.  Defendants also should have been particularly careful about warning investors of the Company's regulatory risks, and providing investors with accurate information with which to assess these regulatory risks.

Instead, however, the defendants misled investors with extremely optimistic statements regarding the Company's new "culture of compliance," which included improper representations regarding the robust job placement figures that the Company purportedly achieved.

## IMPROPER STATEMENTS

78.     The first improper statement was disseminated on February 20, 2009, the day after Career Education issued a press release announcing the Company's fourth quarter 2008 financial results.  During Career Education's fourth quarter 2008 earnings call held on February 20, 2009, Sarah Gubins, an analyst from Bank of America Merrill Lynch, asked defendant McCullough pointedly for "an update on job placement trends for [Career Education] graduates." McCullough reassured Gubins and the market that, despite the challenging economic times, Career Education's students were continuing to be in high demand:

> We obviously think that this is an issue that we've got to be concerned about as an industry, and not just education given what's going on in the macro environment. **To date we haven't seen significant changes in demand for our graduates but it's something we're keeping an eye on. We continue to experience our strongest placements in our Culinary business, where job placements are in excess of 90% in most cases.**

79.     In connection with the publication of Career Education's second quarter 2009 results, the Company again convened analysts and investors on a teleconference to present their earnings on August 6, 2009.  During the question and answer portion of the call, defendant McCullough was again asked, this time by Trace Hill, an analyst with the Signal Hill Group, about placement trends and quantitative placement rates across Career Education's various segments. Defendant McCullough reassured the market that the Company's ability to place its students was strong despite the challenging environment:

> **[W]e haven't seen any significant declines in our placement rates and so we feel good about that.** We're very mindful, one of the things that I am concerned about and I know that we are concerned about in the industry, given what's happening broadly, is our ability to continue to place students. But we have not seen, up til

now, a significant [dis]integration [sic] in our ability to place students…. *We have continued to place students with the companies that we have relationships with at a pretty steady rate.*

80.     During Career Education's third quarter 2009 earnings call held on November 5, 2009, Bank of America Merrill Lynch analyst Sarah Gubins again asked defendant McCullough to discuss "outcomes," including "job placement trends" for Career Education graduates. Defendant McCullough again took steps to reassure the market that the demand for Career Education students remained high despite the challenging economic climate, stating:

> One of our concerns as we come into this marketplace is will we continue to see demand employer demand and we really have worked hard to increase the resources we have available from both a corporate and SVU basis to aid our graduates [in] finding jobs. We have not seen and I have been asking this question a lot internally.

> We have not seen any significant degradation in demand for our students. *We, through the course of this year, have helped and placed 9000 graduates into jobs and we did not see that abate during the third quarter. We continue to see strong placement trends in outcomes in our culinary business. We are able to track these things we feel very, very good about what we see and the continued demand.*

81.     On February 18, 2010, Career Education hosted an Analyst and Investor Day to discuss the Company's annual performance.  During this presentation, defendant McCullough purported to quantify the precise placement rates reported across Career Education's various segments, stating that Career Education's University segment (consisting of AIU, Colorado Technical University, and Art and Design) had a placement rate of 73% and that its career-focused segment (consisting of the Sanford-Brown Institute and Le Cordon Bleu) had a placement rate of 81%.  Career Education specifically represented that these placement rates pertained to students "who have obtained employment in their field or a related field."  Further, these placement rates were touted as "Enablers for Growth," as Career Education stressed to

investors that the Company's regulatory risks were low due to its high graduation and placement rates in an otherwise difficult economy.

82.     On February 19, 2010, relying upon the placement rates publicly disclosed by Career Education, Sterne, Agee & Leach reported in an analyst report that Career Education had a "42% graduation rate and 73% placement rate for University segment; 57% graduation rate and 81% placement rate for career focused segment."

83.     A February 19, 2010 William Blair & Company, L.L.C. report, similarly relying upon placement rates disclosed by Career Education, stated the following:

> *University placement rate (defined as percentage of students who graduated between July 2008 and June 2009 who had jobs in their field of study by December 2009) of 73%; career focused placement rate of 81%.*

84.     On February 23, 2010, Career Education participated in the Credit Suisse Group Global Services Conference.    During this conference, defendant Graham reported strong placement rates, as follows:

> *Our placement rates are in the mid-70s to low 80s, we think those stack up with everyone else's and are very fine numbers especially when you consider this is data from 2009. With 10% unemployment we're still placing 75% to 80% of our students today in a tough economy. So we think we can grow through quality.*

85.     Defendant Graham made similar statements during the Baird Business Solutions Conference on February 25, 2010, again making statements to investors about the importance of placement rates, among other things, as a driver for growth at the Company:

> *Our placement rates in the middle 70's and low 80's, are very strong placement rates. And these are 2009 placement rates. So these are for graduates that graduated at the end of June and have been placed by end of December, in an economy with 10% unemployment. We're placing almost 80% of our students and they're getting jobs.*

86.     On April 21, 2010, Barclays, relying on the placement rates publicly disclosed by Career Education, noted in an analyst report that "the [C]ompany released graduation rates of 42% and 57%, and placement rates of 73% and 81%, at University and Health, respectively."

87.     On June 3, 2010, Career Education presented at the RBC Capital Markets Consumer & Retail Conference.  During this presentation, defendant Graham stated:

> [W]e are a career focused institution from our ground campuses. We also have our online universities. We went out in our Investor Day – and I encourage you to look at the presentation on our website – and defined our placement rates within six months in the field of study. Take look at those. ***Our university groups, our regional credit groups on average placement rates are just under 75% and our ground-focused career schools are just under 80%.***

88.     During the UBS Global Technology and Services Conference a few days later on June 8, 2010, defendant Graham similarly reported:

> We really see four things that are existing in the marketplace and in the Company that will enable growth – quality, new programs, a great technology platform and getting more campuses on the ground. Let me talk about each of those.
>
> First, quality – ***again, we're all about graduating students, retaining students and placing students***. There are a lot of measures of placement rates and a lot of measures of graduation rates in our industry, state accreditors have rules, regional accreditors have rules, national accreditors have rules, we have our own rules.
>
> *     *     *
>
> And placement rate is the same way. ***Again, these are placement rates through the end of the year and you can see that with 10% unemployment in the country, within six months of graduation over 75% of the students leaving our school in the recession got placed in jobs. It speaks to the quality of our programs.***
>
> *     *     *
>
> [W]e change lives through education, we believe we'll have graduated 1 million students and roughly a 75% placement rate, 750,000 people working through our institutions and ***hopefully from there the share price follows because of the good things we're doing for students***.

89.     On June 15, 2010, during the William Blair & Company 30th Annual Growth Stock Conference, defendant Graham again discussed Career Education's purportedly strong placement rates:

> We have been in existence for about 15 years as a Company. We have now graduated 467,000 students. ***And our placement rates currently average around 75%, so we have over 350,000 Americans working because of what we do***. As of today we are educating 116,000 students, 10,000 of those in Europe and the rest are in America.
>
> *   *   *
>
> Most of our students, 41%, are over 30 years old. They are reentering the workforce, reeducating themselves, working on different careers, working on jobs. ***Our job is to educate students, place the students and elevate the students up***.
>
> *   *   *
>
> Our placement rates are for December 31, 2009. So this is the percentage of our population that we placed in a 10% unemployment rate. ***So across-the-board almost 75% to 80% of all of our students graduating in the back half of last year received jobs within six months, which speaks high to our quality and our programs***.

90.     During the Company's second quarter 2010 earnings call on August 5, 2010, McCullough again touted the Company's placement rates, stating:

> Our sector meets the needs of students that are simply not met by the traditional education system.
>
> ***In 2009, our company graduated nearly 50,000 students and as we presented our investor day, we placed approximately 78% of those who graduated by June 30th of last year within their field of study or related field by December 31, 2009***. All of this was accomplished in a 10% unemployment economy. We are proud of that.

91.     On August 9, 2010, Barclays, relying on the placement rates Career Education disclosed to the investing public, reported the following in an analyst report: "Career Education stated that its job placement trends remain on track with the most recent disclosure, which was

that 78% of graduates as of June 30, 2009 were placed in jobs within 6 months of their graduation (81% of career focused grads and 73% of University grads, for blended 78%)."

92.     On September 16, 2010, defendant McCullough spoke at the BMO Capital Markets Back to School Education Conference.  During this conference, defendant McCullough again represented that Career Education schools had strong placement rates, stating:

> Our employment placement rates in the six months that ended June 30 of last year, which is our most recent data, *we were about 78% across the Company*. Again, we are proud of the work that we do in making sure that our students go out and get jobs.

93.     During the fourth quarter 2010 earnings call on February 18, 2011, defendant McCullough stated:

> We also continue to focus on improving students outcomes. As you may recall, at our Investor and Analyst Day in February 2010, we shared our placement statistics for university and career focused schools.
>
> While placement can be measured in a number of ways due to accreditation rules and varying definitions, *we've continued to use the same definition for placement - the percentage of students seeking employment, who graduated during a 12-month period ended June 30, who had jobs in their field of study or related field by December 31. You may recall that in 2009 our career focused schools achieved a placement rate of 81% while the university schools were at 73%. In 2010, our career focused school placement rate fell slightly to 78% while our university placement rate increased slightly to 75%.*

94.     In the Company's 2010 Annual Report dated April 4, 2011, defendant McCullough stated the following concerning the Company's placement rates in his letter to the Company's stockholders:

> In 2010, as the national unemployment rate hovered near 10 percent, we invested in our Career Services and Academic teams, increasing the number of team members by 21 and 17 percent, respectively. *As a result, our University 2010 job placement rate was 75 percent, up 200 basis points from the prior year, while our Career Focused 2010 placement rate was a solid 78 percent, down slightly from 81 percent the prior year.* While job placement can be measured a number of ways due to accreditation rules and varying definitions, *we continue to define placement as the percentage of students seeking employment during a 12-month period ending June 30 who had jobs in their field of study or a related field by*

*Dec. 31*. Given the ongoing economic difficulties in today's job market, I'm pleased with our job placement results. But we will continue to place emphasis on this key area of student success.

95.     On August 5, 2011, relying upon placement rates disclosed by Career Education management, Citigroup Global Markets published the following placement rates for Sanford-Brown campuses in an analyst report on Career Education:

| Sanford-Brown Employment Rates Degrees Offered | Campus Employment Rate |
|---|---|
| **ASSOCIATE'S** | |
| Anesthesiologist Assistant | 66.7% |
| Cardiovascular Technology/Technologist | 62.5% |
| Diagnostic Medical Sonography/ Sonographer and Ultrasound Technician | 63.2% |
| Clinical/Medical Laboratory Technician | 100.0% |
| **CERTIFICATE** | |
| Medical Insurance Specialist/Medical Biller | 77.3% |
| Medical/Clinical Assistant | 80.2% |
| Pharmacy Technician/Assistant | 75.8% |
| Cardiovascular Technology/Technologist | 79.4% |
| Surgical Technology/Technologist | 76.9% |
| Diagnostic Medical Sonography/Sonographer and Ultrasound Technician | 55.2% |
| Massage Therapy/Therapeutic Massage | 96.2% |
| **DIPLOMA** | |
| Dental Assisting/Assistant | 91.6% |
| Medical Insurance Specialist/Medical Biller | 86.0% |
| Medical/Clinical Assistant | 87.5% |

| | |
|---|---|
| Pharmacy Technician/Assistant | 90.2% |
| Cardiovascular Technology/Technologist | 73.8% |
| Surgical Technology/Technologist | 91.7% |
| Diagnostic Medical Sonography/Sonographer and Ultrasound Technician | 86.5% |
| Massage Therapy/Therapeutic Massage | 91.2% |
| **Weighted Average** | **81.4%** |

## REASONS STATEMENTS WERE IMPROPER

96.     The true facts, which were known by the defendants but concealed from the investing public were as follows:

(a)     the Company had engaged in improper and deceptive recruiting practices and that, due to the government's scrutiny into the for-profit education sector, the Company would be unable to continue these practices in the future;

(b)     the Company's practices included reporting unrealistic job placement statistics;

(c)     the Company failed to maintain proper internal controls to prevent job placement statistics from being improperly reported; and

(d)     as a result of the foregoing, the Company's schools faced a threat to their continued accreditation.

## THE TRUTH SLOWLY EMERGES

97.     The defendants' façade began to unravel in May 2011, when it was rumored that Career Education was one of five for-profit education companies being investigated by the NYAG.  Indeed, on May 17, 2011, Career Education received a Subpoena from the NYAG in connection with the NYAG's investigation of whether Career Education's reported placement

rates complied with certain New York state consumer protection, securities, finance, and other laws. The NYAG requested from Career Education and certain of its schools documents concerning a broad range of business practices, including marketing and advertising, student recruitment and admissions, education financing, training and compensation of admissions and financial aid personnel, programmatic accreditation, student employment outcomes, placement rates, and other disclosures made to graduates. The NYAG investigation sought documents dating from May 17, 2005, to the present.

98.     On May 19, 2011, the Subpoena was mentioned in a *New York Times* article that focused on the NYAG's investigation of a for-profit university owned by Donald Trump. In an aside, the article mentioned that Career Education was one of four other companies that received subpoenas from the NYAG. No additional information regarding the NYAG investigation of Career Education was mentioned.

99.     Then, on May 24, 2011, the Company confirmed the NYAG's investigation and disclosed the existence of the Subpoena in a Form 8-K filed with the SEC. The Company stated:

> Career Education Corporation (the "Company") has received from the Attorney General of the State of New York ("Attorney General") a Subpoena Duces Tecum ("Subpoena") dated May 17, 2011, relating to the Attorney General's investigation of whether the Company and certain of its academic institutions have complied with certain New York state consumer protection, securities, finance and other laws. Pursuant to the Subpoena, the Attorney General has requested from the Company and certain of its academic institutions documents and detailed information on a broad spectrum of business practices for the time period May 17, 2005 to the present.

100.    On August 3, 2011, Career Education revealed, in a Form 8-K filing with the SEC, that it had determined that certain of the Company's Health Education schools engaged in "improper practices" when calculating placement rates for the 2010-2011 academic year. Defendants claimed to have discovered this information in connection with preparing a response to the NYAG Subpoena. Additionally, in this Form 8-K filing, the Board announced it had

"directed outside independent legal counsel Dewey & LeBoeuf to undertake a thorough investigation ... of student placements at all of the [C]ompany's domestic schools."

101.    Despite these revelations, the true extent of the false placement rates remained hidden from the public, particularly because defendant McCullough reassured investors that, rather than being a Company-wide issue, the placement rate problems could be attributed to rogue employees.  In a press release dated August 3, 2011, defendant McCullough stated:

> *I am greatly disappointed that some people within our organization have acted inappropriately and not lived up to the standards Career Education expects.*

102.    Then, on November 2, 2011, the preliminary results of the internal investigation by Dewey (the "Dewey Report") were disclosed in a press release issued by the Company.  The Dewey Report detailed the Company's broad inflation of nationwide career placement statistics for its Health Education and Art and Design schools.  The Dewey Report also found "certain placements that lacked sufficient supporting documentation or otherwise did not meet applicable placement guidelines established by the Company."  According to the release, the investigation showed that only thirteen of the Company's forty-nine accredited Health Education and Art and Design schools met the 65% placement rate standards set by their accreditor, the ACICS.  The press release stated:

> *Counsel's investigation confirmed the existence of improper placement determination practices at certain of the Company's Health Education segment schools and, for the Company's Health Education and Art & Design segment schools*, Dewey identified certain placements that lacked sufficient supporting documentation or otherwise did not meet applicable placement guidelines established by the Company.

> *   *   *

> Based on their recently reported 2010-2011 placement rates, *13 of the Company's 49 ACICS-accredited Health Education and Art & Design segment schools met ACICS's 65% minimum placement rate standard for the 2010-2011 reporting period. ACICS could determine that additional schools do not meet its*

*minimum placement rate standard*.  The Company has scheduled a meeting with ACICS to address these reported rates.

103.    Tellingly, high-ranking members of Career Education management resigned immediately upon disclosure of the Dewey Report.  Defendant McCullough, the President, CEO, and a member of the Company's Board, resigned effective October 31, 2011.   Defendant Williams, the Senior Vice President of Culinary Arts; defendant Budlong, the Senior Vice President of International and Chief Administrative Officer; and defendant McNamara, the Senior Vice President of Art and Design, also "resigned."  These swift "resignations" in response to the Dewey Report being made public support an inference that these individuals knew about, encouraged, and condoned the Company's fraudulent placement rate practices.  These individuals should have been terminated for their wrongdoing.  However, because they were allowed to resign, the Company was forced to waste additional corporate assets on severance packages and benefits that these wayward fiduciaries would not otherwise receive if they were terminated for cause.  For instance, defendant McCullough entered into an agreement with the Company under which he was entitled to all the rights and benefits under his employment agreement, unjustly enriching him by almost $5.5 million.

104.    The ACICS underscored the seriousness of the wrongdoing at the Company in a November 8, 2011 press release:

> A school's career placement rate is one of the accountability standards required to attain and maintain accreditation by ACICS. The threshold indicates that any school which does not place at least 65 percent of its graduating students in a job in their field of study (or a related field) is at risk of losing their grant of accreditation.
>
> **ACICS takes any misrepresentation in placement rates – whether intentional or unintentional – very seriously.  As an independent auditor, we do not tolerate misconduct or misleading statistics from schools reporting on job placement rates**. When a school is not in compliance with ACICS' standards and policies, we take appropriate enforcement action.

*We are currently conducting an internal review of our processes for evaluating placement rates, including a review of data collected from site visits and audits of Career Education Corporation from the last few years, to determine why those problems were not detected*.

105.    On November 21, 2011, Career Education announced that it had received a letter from ACICS directing the Company to show cause as to why the accreditations of its forty-nine ACICS-accredited institutions in the Health Education and Art and Design segments should not be "withdrawn by way of suspension." The "show cause" directive related "to the adequacy of the administrative practices and controls relative to the Company's reporting of placement rates to ACICS."

106.    ACICS' show cause proceeding found that sixty out of seventy-one Career Education institutions accredited by ACICS fell below required standards.  The ACICS rejected the methodology employed by Career Education to purportedly correct its fraudulent reporting because, among other things, Career Education's investigators did not examine employment information for each graduate resulting in a purported placement.  Instead, they only reviewed, and purported to correct, a "statistically valid" sample.  Albert C. Gray, executive director of the ACICS, determined "[I]t's not enough – you need to do a better, deeper, broader analysis than that…. You need to have a much fuller analysis of the data than a statistical sample."  Further, in temporarily rejecting Career Education's application, Gray concluded, "The council was not satisfied with the depth and breadth of [the data submitted by Career Education] and did not think it represented a strong enough case for the accuracy of that data."  As a result, sixty out of seventy-one Career Education institutions are now subject to an increased level of scrutiny and oversight in order to keep their accreditation.  This oversight includes more detailed or frequent reporting requirements, the submission of a placement improvement plan, attendance by campus

career service personnel at a placement workshop, additional requirements for new programs, and location approvals or on-site evaluations.

107.    In addition, on December 8, 2011, U.S. Senator Richard J. Durbin called on Career Education to refund tuition to students if their program of study loses accreditation in light of the findings detailed in the Dewey Report. Senator Durbin stated that while he was "pleased that [Career Education has] taken the initiative to disclose this inaccuracy," he remained "deeply concerned for the more [than] 100,000 students attending [Career Education] schools." He called on Career Education to "perform internal audits of other programs and colleges" and to make this information public so that future students can make informed decisions. Senator Durbin further added that for those programs that lose accreditation, "it would only be fair … to refund tuition paid to the students and return federal aid used to the [Department]."

108.    Senator Durbin did not stop there. That same day on December 8, 2011, he also wrote to Dr. Gary R. Carlson, head of the ACICS, urging him to audit additional schools and programs operated by Career Education to ensure that Career Education's students had accurate information, and to the Honorable Arne Duncan, Secretary of Education, urging him to consider taking enforcement action against Career Education for violating the Department's program integrity regulations, which prohibit "false, erroneous, or misleading statements ... in regards to educational programs, its financial charges, or the employability of its graduates." According to Senator Durbin, "[i]nflating job placement rates seems to be in direct violation of this regulation. Based on the facts disclosed to date, [Career Education] appears to have violated this requirement for eligibility for Federal student aid."

109.    Then, on June 7, 2012, the ACCSC sent a letter to the Company. This letter directed the Company to show cause why the ten institutions accredited by the ACCSC should

not lose their accreditation. Moreover, the letter from ACCSC set forth the accreditor's requirements for the Company's institutions to demonstrate compliance with ACCSC's accrediting standards, which include the accelerated submission of 2012 ACCSC employment placement rate data for each program offered at the ACCSC institutions, utilization of an independent third party to audit 100% of this employment placement rate data, and additional analysis of previously submitted placement data. ACCSC plans to review the Company's response to the show cause directive during its November 2012 meeting.

110.    The truth about the Company's improper job placement reporting and growing government scrutiny destroyed Career Education's market capitalization, bringing it down from a company worth $1.77 billion to $451 million. This amounted to a staggering 74% decline in value.

## THE IMPROPER REPURCHASES

111.    The Individual Defendants' improper statements caused the Company's stock to trade at artificially inflated levels. Despite knowing or recklessly disregarding the fact that the value of the Company was inflated, defendants McCullough, Chookaszian, Devonshire, Gross, Jackson, Lally, Lesnik, Snyder, and Thornton authorized and implemented a repurchase of Career Education's stock with Company money in February 2010.

112.    From February 2010 to August 2011, defendants McCullough, Chookaszian, Devonshire, Gross, Jackson, Lally, Lesnik, Snyder, and Thornton caused the Company to repurchase approximately 9,971,745 shares of its stock at an aggregate cost to the Company of over $252 million. The purchases of the Company's stock were at artificially inflated prices as a result of the improper statements, press releases, and filings with the SEC that failed to disclose

material information regarding the Company's improper recruiting practices and overstated business prospects.

113.    Despite defendants McCullough, Chookaszian, Devonshire, Gross, Jackson, Lally, Lesnik, Snyder, and Thornton's knowledge of the true facts about the Company's lack of compliance with various federal and state regulations and the resulting threat to its students' access to federal funding, they did not halt the Company's purchases and continued to allow the Company to purchase shares at artificially inflated prices.    Defendants McCullough, Chookaszian, Devonshire, Gross, Jackson, Lally, Lesnik, Snyder, and Thornton's decision was not the product of a valid business judgment.

114.    Under defendants McCullough, Chookaszian, Devonshire, Gross, Jackson, Lally, Lesnik, Snyder, and Thornton's purview, the Company bought back its shares at a weighted average price of $25.28, which was over three times as high as Career Education's share price of approximately $7 per share when the truth about its inaccurate job placement statistics was revealed.    The following chart illustrates the average prices paid for the Company's common stock during the repurchase period:

| February 2010 Repurchase Program ($250 Million Authorized) | Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|---|
| | Feb-10 | 309,200 | $27.48 | $8,496,816 |
| | Mar-10 | 1,346,501 | $30.60 | $41,202,931 |
| | Apr-10 | 1,555,145 | $32.18 | $50,044,566 |
| | May-10 | 513,749 | $29.73 | $15,273,758 |
| | Jan-11 | 3,721,903 | $21.47 | $79,909,257 |
| | Feb-11 | 140,000 | $23.67 | $3,313,800 |
| | Mar-11 | 282,800 | $23.61 | $6,676,908 |
| | May-11 | 929,258 | $21.74 | $20,202,069 |
| | Jun-11 | 846,089 | $23.36 | $19,764,639 |
| | Jul-11 | 400 | $22.00 | $8,800 |
| | Aug-11 | 326,700 | $21.87 | $7,144,929 |
| Total: | | 9,971,745 | | $252,038,473 |

The difference between the aggregate cost and the current value of the repurchases is approximately $213,348,103.

115.    Because the price of Career Education's shares was artificially inflated by way of the Individual Defendants' concealment and misrepresentations, the Company materially overpaid for its own stock.   The stock purchases falsely signaled to Career Education's shareholders and the public that the purchase of the Company's stock at those prices was the best use of Career Education's cash.  Thus, defendants McCullough, Chookaszian, Devonshire, Gross, Jackson, Lally, Lesnik, Snyder, and Thornton breached their fiduciary duties and committed corporate waste by causing Career Education to purchase over $252 million of its own shares at artificially inflated prices.

## DAMAGES TO CAREER EDUCATION

116.    As a result of the Individual Defendants' improprieties, Career Education violated Department regulations and disseminated improper public statements, including, but not limited to, inaccurate job placement statistics.  Career Education has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

117.    As a direct and proximate result of the Individual Defendants' actions, Career Education has expended and will continue to expend significant sums of money.   Such expenditures include, but are not limited to:

(a)    costs incurred in investigating, defending, and settling and/or paying a judgment in the pending securities fraud class action, which has survived a motion to dismiss, in part;

(b)     legal fees, settlements, and/or judgments in the litany of lawsuits filed against the Company by students misled by the Company's improper recruiting practices and inaccurate job placement statistics;

(c)     costs incurred in potentially refunding tuition to students if the school they attended loses its accreditation;

(d)     costs incurred from responding to the investigations of states' attorneys general;

(e)     costs incurred from responding to ACICS' "show cause" directive;

(f)     costs incurred from responding to ACCSC's "show cause" directive;

(g)     amounts paid to outside lawyers, accountants, and investigators in connection with Career Education's internal investigation into its improper business practices;

(h)     costs incurred from repurchasing over $252 million of the Company's own stock at artificially inflated prices;

(i)     costs incurred from the increased level of government scrutiny and oversight the Company must endure in order to maintain their schools' accreditation; and

(j)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Career Education.

118.    Moreover, these actions have irreparably damaged Career Education's corporate image and goodwill.  For at least the foreseeable future, Career Education will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have engaged in fraudulent activities, such that Career Education's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Furthermore, Career Education's reputation and/or relationship with its current and

future students, and government entities in charge of federal funding, has been harmed, which may adversely affect the Company's future business.

## DEMAND REFUSED

119.    Plaintiff brings this action derivatively in the right and for the benefit of Career Education to redress injuries suffered by Career Education as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   Career Education is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.    Plaintiff will adequately and fairly represent the interests of Career Education in enforcing and prosecuting its rights.

121.    Plaintiff is a Career Education shareholder and Plaintiff has continuously owned Career Education stock since 2007.

122.    Plaintiff has made a demand upon the Board to investigate and remedy the violations of law described herein as required by Delaware law.  As set forth below, the Board has wrongfully refused plaintiff's demand.  The Board's wrongful decision to refuse plaintiff's demand was unfounded in law, and was not made independently, on the basis of a good faith and reasonable investigation of the claims made in plaintiff's demand.  The members of the Board breached their fiduciary duty to inform themselves of all material information reasonably available before determining to refuse plaintiff's demand, and their decision was not in the best interests of Career Education.   The Board's decision is not entitled to the protection of the business judgment rule.

123.    On May 15, 2012, plaintiff made a litigation demand on Career Education's Board to "immediately commence a fulsome investigation into the conduct of [defendants] McCullough and Graham, and any other culpable fiduciaries its uncovers," including members of the Audit Committee, defendants Chookaszian, Devonshire, Gross, and Snyder, and to "act to recover monetary damages from those individuals responsible for the misconduct and, if appropriate, remove that individual from their position."  Plaintiff explained that, "[i]f a voluntary resolution of the matter cannot be reached, the Board should institute litigation against the responsible individuals…" (the "Demand").  The Demand outlined evidence of gross mismanagement, specified false and misleading statements and the reasons for their falsity, and described the injuries caused to Career Education.  A true and correct copy of the Demand is attached hereto as Exhibit A.

124.    On June 13, 2012, the Board, through its outside counsel, Edward M. Crane, Esq. of the law firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), responded to plaintiff. Mr. Crane stated that the Board reviewed the Demand.  He also stated that there were two derivative actions pending that asserted "allegations similar to the concerns raised in the [Demand]."  Mr. Crane informed plaintiff that, in addition to moving to dismiss the complaint in the federal derivative action for failing to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Company also joined in the individual defendants' motions to dismiss the action for failing to plead that a demand on the Board would have been futile.  Mr. Crane then stated that given these pending actions, the Board believed the investigation plaintiff demanded was premature, thereby refusing his Demand.  Thus, despite arguing or joining in filings stating that a demand upon the Board was not futile, the Board chose to reject the Demand without even

looking into the wrongdoing it identified.  A true and correct copy of Mr. Crane's June 13, 2012, letter is attached hereto as Exhibit B.

125.    On June 29, 2012, plaintiff's counsel wrote to Mr. Crane and asked the Board to reconsider its position.  Plaintiff explained that "[a]bsent immediate Board investigation, oversight, and swift action, including but not limited to implementation of sufficient controls and procedures designed to ensure the accurate reporting of [the Company's] placement rates, the problems facing [Career Education] will only continue to accumulate and worsen." Plaintiff pointed to the ACCSC's recent letter directing the Company to show cause why it should not withdraw its accreditation.  A true and correct copy of plaintiff's June 29, 2012, letter is attached hereto as Exhibit C.

126.    On July 6, 2012, Mr. Crane responded to plaintiff's letter.  It reiterated that the Board would not investigate the issues raised in the Demand, calling it premature.  A true and correct copy of Mr. Crane's July 6, 2012, letter is attached hereto as Exhibit D.

127.    On September 17, 2012, Chaka Patterson, Esq., from Skadden sent plaintiff a letter enclosing documents filed in the federal derivative action.  The letter did not state on whose behalf Mr. Patterson was writing.  Nor, did Mr. Patterson explain the connection between filings in the federal derivative action and the Board's refusal to investigate plaintiff's Demand. The only thing Mr. Patterson stated was that the Board passed resolutions to form a SLC "specifically to investigate the issues raised in your Demand Letters dated May 15, 2012 and June 29, 2012."  The enclosure consisted of defendants' motion to stay the federal derivative action and an exhibit to the motion.  True and correct copies of Mr. Patterson's September 17, 2012 letter, the motion to stay, and the exhibit to the motion to stay are attached hereto as Exhibits E, F, and G, respectively.

128.    The Company and the other defendants in the federal derivative action sought a stay of that action on two bases.  First, they sought a stay of the litigation while the Board formed the SLC and the SLC conducted an investigation.  The defendants also sought a stay due to the outstanding securities fraud class action.  Thus, the defendants were seeking to stay the same case that served as the basis for the Board's refusal to even consider the claims in plaintiff's Demand.

129.    Further, despite Mr. Patterson's assertion, the resolutions adopted by the Board show that the SLC was not formed "specifically to investigate the issues raised in [plaintiff's] Demand Letters."  In fact, the resolutions make no mention of the Demand at all.  The resolutions specifically refer to the demand futility derivative actions pending against the Company.

130.    Mr. Patterson's September 17, 2012, letter confirmed that the Board would not consider the allegations in plaintiff's Demand.  Despite reviewing the plaintiff's initial letter five months ago, the Board still demands an indefinite reprieve of its duty to consider plaintiff's Demand.  This is not the product of the Board's exercise of its business judgment.

131.    No legal action has been filed by Career Education against any of the Individual Defendants.  Two of the primary architects of the campaign of misleading statements have been allowed to resign and retire and allowed to receive their unearned severance, rather than being terminated for cause.  After the true state of Career Education's dreadful financial condition was disclosed over the course of 2012, rather than act in the best interests of the Company, the Board instead has focused its efforts on delaying a proper review of the facts detailed in the Demand. Defendants breached their fiduciary duties to Career Education and caused or permitted the Company to violate federal securities laws, exposing Career Education to tens and possibly

hundreds of millions of dollars in damages and irreparably damaging Career Education's credibility in the capital markets.

132.    The Board's decision to refuse the Demand was not within the ambit of the business judgment rule.  The decision had no basis in law, was not based upon a reasonable investigation conducted in good faith, and is plainly not in the best interests of Career Education. Moreover, the Board did not act with due care in making its decision.

133.    Accordingly, plaintiff's institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

134.    Plaintiff has not made any demand on the other shareholders of Career Education to institute this action since such demand would be a futile and useless act for at least the following reasons:

        (a)    Career Education is a publicly held company with over sixty-seven million shares outstanding and thousands of shareholders;

        (b)    making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

        (c)    making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against Defendants McCullough and Graham for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder

135.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.    Defendants McCullough and Graham disseminated or approved public statements

that improperly portrayed Career Education's job placement rates. Defendants McCullough and Graham knew that these reported job placement rates were misleading and intended to deceive, manipulate, and/or defraud in connection therewith.

137. At the same time the price of the Company's common stock was inflated due to the improper reporting of Career Education's job placement rates, defendants McCullough and Graham were causing Career Education to repurchase over $252 million worth of its own stock on the open market at an average inflated price of approximately $25.28 per share, which is over three times as high as Career Education's share price of approximately $7 per share when the truth about its inaccurate job placement statistics was revealed.

138. As such, defendants McCullough and Graham violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Career Education and others in connection with their purchases of Career Education common stock.

139. As a result of defendants McCullough and Graham's misconduct, Career Education has and will suffer damages in that it paid artificially inflated prices for Career Education common stock purchased on the open market. The Company would not have purchased Career Education common stock at the prices it paid, had the market previously been aware that the market price of Career Education' stock was artificially and falsely inflated by

defendants McCullough and Graham's misleading statements. As a direct and proximate result of defendants McCullough and Graham's wrongful conduct, Career Education suffered damages in connection with its purchases of Career Education common stock. By reason of such conduct, defendants McCullough and Graham are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Against the Audit Committee Defendants for Violation of
### Section 20(a) of the Exchange Act

140. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141. The Audit Committee Defendants directly or indirectly controlled or induced the Individual Defendants who violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

142. These defendants are jointly and severally liable to the same extent as the Individual Defendants who violated section 10(b) of the Exchange Act and SEC Rule 10b-5 under section 20(a) of the Exchange Act. These defendants did not act in good faith.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

143. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144. The Individual Defendants owed and owe Career Education fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Career Education the highest obligation of good faith, fair dealing, loyalty, and due care.

145. The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Career Education, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

146. The Officer Defendants, McCullough, Graham, Lesnik, O'Sullivan, Grayeb, Williams, McNamara, and Budlong, breached their duty of loyalty by knowingly, recklessly, or with gross negligence causing and/or allowing the Company to engage in improper recruiting practices. In addition, defendants McCullough, Graham, Lesnik, O'Sullivan, Grayeb, Williams, McNamara, and Budlong breached their duty of loyalty by causing the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures. As a result of these deficiencies, defendants McCullough and Graham knowingly, recklessly, or with gross negligence made improper statements in the Company's conference calls, press releases, and public filings concerning the Company's compliance with regulatory law.

147. The Director Defendants, McCullough, Lesnik, Chookaszian, Gross, Devonshire, Thornton, Lally, Jackson, and Snyder, breached their duty of loyalty by knowingly, recklessly, or with gross negligence causing and/or allowing the Company to engage in improper recruiting practices. Furthermore, the Director Defendants breached their fiduciary duty of loyalty by failing to ensure that an adequate system of internal controls was in place. The Director Defendants breached their duty by either knowingly or recklessly ignoring the Company's compliance with regulatory law, and allowing these issues to continue unabated. In addition, defendants McCullough, Lesnik, Chookaszian, Gross, Devonshire, Thornton, Lally, Jackson, and

Snyder breached their duty of loyalty by causing the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures. Finally, defendants McCullough, Lesnik, Chookaszian, Gross, Devonshire, Thornton, Lally, Jackson, and Snyder breached their fiduciary duty by authorizing a repurchase of the Company's stock at artificially inflated prices.

148.    The Audit Committee Defendants, Chookaszian, Gross, Devonshire, and Snyder, breached their fiduciary duty of loyalty by knowingly or recklessly overseeing and allowing the Company's improper recruiting practices and implementation of a business model that put the Company at risk of losing accreditation and federal funding for its schools. This constituted a violation of the duties of the members of the Audit Committee under its Charter. In addition, defendants Chookaszian, Gross, Devonshire, and Snyder, as members of the Audit Committee, reviewed and approved the improper statements regarding the Company's job placement statistics.

149.    The Compensation Committee Defendants, Devonshire, Gross, Jackson, and Lally, breached their fiduciary duty of loyalty by awarding excessive and unjustified compensation to defendant McCullough, notwithstanding defendant McCullough's wrongful conduct alleged herein and the significant damage caused to Career Education as a result of such conduct. The Compensation Committee Defendants completely and utterly failed in their duty to review and approve the compensation of Career Education's executive officers, as required by the Compensation Committee Charter in effect at the time.

150.    Defendants Lesnik, Chookaszian, Gross, Devonshire, Thornton, Lally, and Jackson's refusal of plaintiff's Demand was in bad faith and in breach of their duty of loyalty. Defendants Lesnik, Chookaszian, Gross, Devonshire, Thornton, Lally, and Jackson failed to

conduct a reasonable investigation into the allegations of plaintiff's Demand despite the fact that plaintiff's Demand specified the wrongdoing which had occurred at Career Education and identified those responsible.

151.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

152.     Plaintiff, on behalf of Career Education, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

153.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.     As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in purchasing artificially inflated Career Education stock and defending itself in the securities class action lawsuit that they brought on with their improper statements.  The securities class action recently survived a motion to dismiss, thus significantly increasing the costs to the Company of the lawsuit.  In addition, by failing to conduct proper supervision, the Individual Defendants have caused Career Education to waste its assets by paying improper compensation to certain of its executive officers and directors that breached their fiduciary duty.

155.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

156.     Plaintiff, on behalf of Career Education, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

157.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Career Education.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Career Education.

159.    Plaintiff, as a shareholder and representative of Career Education, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

160.    Plaintiff, on behalf of Career Education, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands for a judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Career Education to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Career Education and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments

to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

       1.      a proposal to ensure the establishment, maintenance, and oversight of the Company's Title IV compliance;

       2.      a proposal to strengthen the Company's disclosure controls and procedures;

       3.      a proposal to regulate the Board's future authorizations of stock repurchases;

       4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

       5.      a provision to permit the shareholders of Career Education to nominate at least three candidates for election to the Board;

       C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Career Education has an effective remedy;

       D.      Awarding to Career Education restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

       E.      Awarding to plaintiff reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

       F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Date: November 5, 2012

MILLER LAW LLC

*s/ Lori A. Fanning*
LORI A. FANNING
Marvin A. Miller
Lori A. Fanning
115 S. LaSalle Street
Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
Facsimile: (312) 676-2676
mmiller@millerlawllc.com
lfanning@millerlawllc.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS
KEVIN S. KIM
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsumeda.com
csmith@robbinsumeda.com
ssanders@robbinsumeda.com
kkim@robbinsumeda.com

HOLZER HOLZER & FISTEL LLC
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
mfistel@holzerlaw.com

*Attorneys for Plaintiff*

782347

# Exhibit A



# HOLZER HOLZER
## & FISTEL LLC
### ATTORNEYS AT LAW

May 15, 2012

**VIA CERTIFIED U.S. MAIL**

*Receipt No. 7004 1350 0005 0470 2985*

Board of Directors
Career Education Corporation
c/o Jeffrey D. Ayers
Senior Vice President, General Counsel
and Corporate Secretary
231 N. Martingale Rd.
Schaumburg, IL 60173

      **Re:**   *Shareholder Demand Letter*

Dear Board of Directors:

      I write on behalf of Mr. Gregory Alex, who owns shares of Career Education Corporation ("CECO" or the "Company").

      As you know, CECO, CECO's former Chief Executive Officer ("CEO") Gary E. McCullough, and CECO Executive Vice President and Chief Financial Officer ("CFO") Michael Graham have been named as defendants in a pending class action lawsuit alleging violations of the federal securities laws, captioned *Thurman Ross v. Career Education Corp., et al.*, Civil Action No. 1:12-cv-00276 (N.D. Ill.) ("Securities Action"). These allegations against two of CECO's highest executives are of serious concern to Company shareholders, including Mr. Alex. The Board of Directors should investigate whether the alleged misconduct in fact occurred and act to hold any individual responsible for any harm that results from the alleged wrongdoing.[1]

      Specifically, the Securities Action alleges that, in violation of the Securities and Exchange Act of 1934 ("Exchange Act"), Messrs. McCullough and Graham knowingly made statements that were false and misleading regarding: (i) the Company's job placement rates; (ii) the Company's schools' accreditations; (iii) the Company's compliance with applicable laws and regulations; and (iv) other gainful employment data relating to graduates of CECO-owned and operated schools. Investors were led to believe during the Securities Action Class Period of February 19, 2009 through November 21, 2011 that CECO was effectively placing large numbers of its students in jobs offering gainful, long-term employment. Messrs. McCullough and Graham are alleged to have designed a number of fraudulent and manipulative means to

---

[1]     By making this demand, Mr. Alex is in no way acknowledging that any member of the Board is capable of independently or objectively acting on behalf of the Company or is otherwise capable of considering these demands.

Board of Directors of Career Education Corporation
May 15, 2012
Page 2 of 6

present strong (but intentionally inflated) placement numbers. These false, inflated placement rates were substantially higher than the actual placement rates, and effectively concealed from the public the significant risk to CECO that many of its schools would lose accreditation and access to federal aid in deriving revenues. These inflated placement numbers are alleged to have been sanctioned and approved by senior members of CECO's management.

The façade began to unravel on May 19, 2011, when it was rumored that CECO was one of five for-profit education companies being investigated by the Attorney General of the State of New York (the "NYAG"). On May 24, 2011, in a Form 8-K filing with the Securities and Exchange Commission (the "SEC"), CECO confirmed that it had received a subpoena from the NYAG dated May 17, 2011 in connection with the NYAG's investigation into whether the Company and certain of its schools complied with certain New York state consumer protection, securities, finance and other laws. On August 3, 2011, the Company reported on a Form 8-K that it had found "improper practices at certain of its health education segment campuses relating to the determination of reported placement rates."

In the August 3, 2011 release, the Company's Board of Directors announced it had "directed outside independent legal counsel Dewey & LeBoeuf LLP to undertake a thorough investigation . . . of student placements at all of the [C]ompany's domestic schools." In response to this announcement, CECO's market capitalization plummeted, declining more than 15% on the date of this disclosure. CECO's market capitalization declined another 13% over the subsequent two-day period. But the true extent of the false placement rates remained hidden from public, particularly because Mr. McCullough reassured investors by stating in CECO's August 3, 2011 8-K that, rather than being a Company-wide issue, the placement rate problems could be attributed to rogue employees.

Then, on November 1, 2011, the preliminary results of the internal investigation by Dewey & LeBoeuf LLP (the "Dewey Report") were disclosed in a press release issued by the Company. The Dewey Report detailed the Company's broad inflation of nationwide career placement statistics for its Health Education and Art & Design schools. The Dewey Report also found "certain placements that lacked sufficient supporting documentation or otherwise did not meet applicable placement guidelines established by the Company." According to the release, the investigation showed that only 13 of the Company's 49 accredited Health Education and Art & Design schools met the 65% placement rate standards set by their accreditor – the Accrediting Counsel for Independent Colleges and Schools ("ACICS"). In response to the announcement of the Dewey Report's findings, the Company's market capitalization declined by 54% over the next two days.

Tellingly, high-ranking members of CECO management resigned immediately upon disclosure of the Dewey Report. Mr. McCullough, the President, CEO, and a member of the Company's Board of Directors, resigned effective October 31, 2011. Brian R. Williams, the Senior Vice President of Culinary Arts, Thomas G. Budlong, the Senior Vice President of International and Chief Administrative Officer, and Thomas A. McNamara, the Senior Vice President of Art & Design, also "resigned." These swift "resignations" in response to the Dewey

Board of Directors of Career Education Corporation
May 15, 2012
Page 3 of 6

Report being made public support an inference that these individuals knew about, encouraged, and condoned the Company's fraudulent placement rate practices, and were asked to resign, and did resign, rather than face the unwelcome prospect of being forced to resign.

Indeed, according to information allegedly obtained from former CECO employees, the questionable practices that were being used to inflate the placement rates were known by officers at CECO's highest ranks—all the way up to Mr. McCullough himself. For example, according to one former employee, Mr. McCullough knew the Company routinely counted short-term jobs at community health fairs as confirmed placements, because when attending a three-day conference in CECO's home office in Illinois, CECO Career Service Directors spoke to Mr. McCullough directly about their success in placing students in short-term jobs at community health fairs. In response, McCullough allegedly congratulated the Directors for "what a great job [they] did."

Other high-ranking leaders of the Company are also alleged to have knowledge of the improper placement rates. For example, according to a former employee, Diane Engelhardt, the Divisional Director responsible for overseeing the Presidents at all of CECO's colleges, witnessed a PowerPoint presentation prepared by the former employee regarding job placements at health fairs and responded by stating the presentation was "fabulous." Like McCullough, Engelhardt knew that these short-term placements were being included in the Company's reported placement rates because she had been informed by the Company's employees about the health fair placements. According to another former employee, there was a significant amount of pressure put on him/her and other Career Services Representatives, including those at the Director level and corporate level, to maintain positive placement rates. Several other former employees similarly reported Company-wide pressure to meet placement numbers, including pressure from corporate-level employees at the Company.

The Securities Action is only the latest instance of the Company's fiduciaries being accused of systemic fraud that have resulted in the Company being damaged. In 2003, CECO was sued by a former Director of Career Services who claimed that students who had not completed required courses or internships were allowed to graduate, and that students were being presented to potential employers as good candidates even though they had not completed the required coursework or had received failing grades. In December 2003, a former registrar at a CECO school filed a complaint with the ACICS accusing CECO of tampering with student records to ensure that the school's then-new campus could pass inspections by accreditors. The former registrar alleged, among other things, that CECO management had asked staff members "to commit forgery, fraud, perjury or whatever else is necessary to [permit the school] to pass [accreditation] audit inspections." In response to calls to the Board regarding the widespread falsification of records concerning student enrollment, the Company's Audit Committee determined that an investigation should commence, and in May 2003, the internal investigation confirmed the allegations of student record falsification.

Board of Directors of Career Education Corporation
May 15, 2012
Page 4 of 6

In 2004, CECO was sued for securities fraud in the United States District Court for the Northern District of Illinois (the "2004 Securities Fraud Action"). In the 2004 Securities Fraud Action, CECO was accused, among other things, of "regularly falsifying student records in order to increase graduation rates and enrollment, [and] conceal problems that could have threatened the accreditation of its schools." After years of costly litigation, CECO paid $4.9 million to settle these allegations.

Because of the Company's officers' and directors' checkered history of being upstanding corporate fiduciaries, the intense government scrutiny of for-profit education in general, and the Company's leaders' consequently heightened awareness of the toll that adverse regulatory actions and compliance issues could take on the Company, the Company and its leaders knew the robust placement rates communicated to analysts and investors were decidedly false. Moreover, because the achievement of placement rates and the accurate reporting of placement rates were such a critical part of CECO's business, Messrs. McCullough and Graham should have ensured the accurate and truthful reporting of placement rates, and should have instituted sufficient controls and procedures designed to ensure the accurate reporting of CECO's placement rates to accreditors and investors alike. Yet, the Company's officers and directors failed to disclose that the Company's purported placement rates and accreditations were achieved only through an improper course of conduct and through manipulative means that placed the Company's primary source of revenue in jeopardy. In other words, the Company's management allegedly designed, approved, and condoned a wrongful and risky scheme to artificially inflate placement rates and thereby mislead analysts and investors.

Given these serious allegations, Mr. Alex hereby demands the Board immediately commence a fulsome investigation into the conduct of Messrs. McCullough and Graham, and any other culpable fiduciaries its uncovers, as it relates to the Securities Action that alleges each violated the federal securities laws and/or their fiduciary duties to the Company. The investigation should determine:

1) whether any false or misleading statements were issued to investors at any time since February 19, 2009;

2) if false or misleading statements were issued, who was responsible for making them;

3) what harm has or will CECO suffer, either monetarily or to its reputation, from the issuance of false or misleading statements;

4) whether the false or misleading statements should have been prevented by the internal controls CECO maintained at the time; and

5) what improvements in the Company's internal controls would have reduced the chance of false or misleading statements being issued.

Board of Directors of Career Education Corporation
May 15, 2012
Page 5 of 6

The investigation should be conducted by independent and disinterested members of the Board of Directors and should not include any member of the Audit Committee who served in that role between February 19, 2009 and November 21, 2011. Excluding members of the Audit Committee from considering the allegations against Messrs. McCullough and Graham is appropriate here given their potential liability for failing to comply with their own fiduciary duties. If the allegations of securities fraud are determined to be true, steps must be taken to review the conduct of Audit Committee members Dennis H. Chookaszian, David W. Devonshire, and Patrick W. Gross. Members of the Audit Committee would have either known of the misconduct and willfully turned a blind eye to it or failed to maintain adequate oversight of the operations of the Company. Either way, the source of the failure must be determined and steps taken to prevent similar misconduct from occurring again.

To that end, the Audit Committee's role in overseeing the operation of CECO and ensuring the Company's financial statements are true and accurate should be improved. Therefore, the Board should also:

1) review internal corporate policies relating to the Audit Committee's oversight of public statements issued on the Company's behalf that could, if false or misleading, expose CECO to future liability; and

2) assess whether any member of CECO's Audit Committee breached their fiduciary duty to the Company in connection with the alleged wrongdoing.

As a result of the Company's fiduciaries' failure to ensure that it disseminated accurate statements regarding its job placement rates and compliance with applicable laws and regulations, CECO has been, and will continue to be, severely damaged and injured. When the truth about the improper statements came to light, CECO's market capitalization declined by hundreds of millions of dollars. As a result of these improper statements, the Company was named as a defendant in a class action lawsuit on behalf of Company investors that alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder. As a direct and proximate result of their conduct, CECO has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

1)      costs incurred in defense of the pending class action case; and

2)      costs incurred from compensation and benefits wrongly paid to individuals that breached their duties to the Company.

If any wrongdoing is found to have occurred following the investigations, Mr. Alex demands that the Board act to recover monetary damages from those individuals responsible for the misconduct and, if appropriate, remove that individual from their position. If a voluntary resolution of the matter cannot be reached, the Board should institute litigation against the responsible individuals and take such other corrective action as may be warranted.

Board of Directors of Career Education Corporation
May 15, 2012
Page 6 of 6


Please confirm, as soon as possible but not later than 30 days from today, that the Company has commenced an investigation into these serious allegations. Please also confirm who has been appointed to conduct the investigation, whether they have retained outside counsel (and if so, who), and the scope and authority of the investigation.

Thank you for your attention to this matter. Do not hesitate to contact me should you have any questions or wish to discuss this matter further.

Best Regards,

Michael I. Fistel, Jr.
/ly ws

Michael I. Fistel, Jr.

cc:     Gregory Del Gaizo, Esq. (via e-mail)

# Exhibit B

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

155 NORTH WACKER DRIVE

CHICAGO, ILLINOIS 60606-1720

TEL: (312) 407-0700

FAX: (312) 407-0411

www.skadden.com

DIRECT DIAL
312-407-0522
EMAIL ADDRESS
EDWARD.CRANE@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

June 13, 2012

**Via Federal Express**

Michael l. Fistel, Jr.
Holzer Holzer & Fistel LLC
200 Ashford Center North
Suite 300
Atlanta, GA 30338

*Re:*     *Shareholder Demand Letter*

Dear Mr. Fistel:

This Firm represents the Board of Directors (the "Board") of Career Education Corporation ("CEC" or the "Company").

CEC's Board members have reviewed your letter dated May 15, 2012, and received May 22, 2012, which was sent on behalf of your client, Gregory Alex (the "Letter"). On the Board's behalf, we thank you for the Letter.

As you may be aware, two derivative actions that name CEC's Board members and other CEC current and former employees as defendants are currently pending. *Bangari v. Steven H. Lesnick, et al.*, No. 11 CH 41973, is pending in the Circuit Court of Cook County, Chancery Division ("*Bangari*"), and *Cook v. Gary E. McCullough, et al.*, No. 11 CV 09119, is pending in the United States District Court for the Northern District of Illinois ("*Cook*"). The Company is named as a nominal defendant in both actions. In addition, a putative federal securities class action, captioned *Ross v. Career Education Corp., et al.*, No. 12 CV 00276, is currently pending in the United States District Court for the Northern District of Illinois ("*Ross*"). CEC is a named defendant in *Ross*. Each of these cases asserts allegations similar to the concerns raised in the Letter.

Michael I. Fistel, Jr.
June 13, 2012
Page 2

As you may also be aware, the individual defendants named in *Bangari* and *Cook* are contesting those actions based on the respective plaintiffs' failure to plead that a demand on the Board would be futile. The Company has joined those motions. In addition, all the defendants in *Ross*, including the Company, recently filed a motion to dismiss that action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

After thoughtful consideration, given the pending actions, including in particular *Ross* in which the Company is alleged to have violated the federal securities laws, CEC's Board believes that an investigation at this time regarding the issues raised in the letter would be premature. Moreover, an investigation at this time might inappropriately divert the Company's financial and management resources from its defense of the pending actions. Accordingly, the Board believes it appropriate and prudent to defer the investigation requested in your letter while the aforementioned actions are pending. Decisions in these actions could determine to what extent an investigation might be necessary. The Board will continue to monitor these cases and advise you promptly of its ultimate determination at an appropriate time in the future.

Thank you again for your letter.

Very truly yours,

Edward M. Crane

cc:     CEC's Board of Directors
        Jeffrey D. Ayers

# Exhibit C



HOLZER HOLZER
& FISTEL LLC
ATTORNEYS AT LAW

June 29, 2012

<u>**VIA FEDERAL EXPRESS**</u>

Board of Directors
Career Education Corporation
c/o Edward M. Crane, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive
Chicago, Illinois 60606-1720

      Re:    *Response to Shareholder Demand Letter*

Dear Board of Directors:

      I write on behalf of our client, Mr. Gregory Alex, a shareholder of Career Education Corporation ("CECO" or the "Company"). We are in receipt of your letter dated June 13, 2012 (the "Response"). In the Response, you state that the Board has refused to initiate litigation in response to Mr. Alex's demand. You state the reasons for coming to this conclusion are that an investigation would be "premature" in light of pending civil litigation against CECO and that such an investigation would "inappropriately divert the Company's financial and management resources from its defense of the pending actions."

      Mr. Alex respectfully requests that you reconsider your decision. Absent immediate Board investigation, oversight, and swift action, including but not limited to implementation of sufficient controls and procedures designed to ensure the accurate reporting of CECO's placement rates, the problems facing CECO will only continue to accumulate and worsen. As detailed in Mr. Alex's demand, the pending securities action is only the latest instance of mismanagement and breaches of fiduciary duty at CECO. In addition, postponing an investigation under these circumstances would not be reasonable in light of the systemic and expedited changes needed to prevent imminent and serious harm to the Company's core revenue streams.

      The imminent danger threatened to the Company's core business was recently illustrated by the Company's 8-k filed June 12, 2012, wherein the Company disclosed that it had received a letter from the Accrediting Commission of Career Schools and Colleges ("ACCSC") notifying the Company that ACCSC voted to direct the Company's ten ACCSC-accredited campuses to show cause as to why accreditation should not be withdrawn from each of the Institutions. The show-cause directive resulted from ACCSC's information requests to the Company regarding student placement determination practices and reported employment rates to ACCSC. In response to this disclosure, the Company's stock price plummeted 11% from a high of $6.34 on June 12, 2012, to a low of $5.62 on June 13, 2012, resulting in the Company's shares' lowest price in more than a decade and tens of millions of dollars in lost market capitalization.

Board of Directors of Career Education Corporation
June 29, 2012
Page 2 of 2

The market's keen focus on CECO's accreditation and disclosures related thereto demonstrates that waiting until resolution of the pending – and potentially lengthy – litigation to conduct even an investigation of the issues raised by Mr. Alex is unreasonable and harmful to the Company.

We trust that you will reconsider your refusal.

Best Regards,

Michael I. Fistel, Jr.

cc:     Gregory Del Gaizo, Esq. (via e-mail)

# Exhibit D

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

155 NORTH WACKER DRIVE

CHICAGO, ILLINOIS 60606-1720

———

TEL: (312) 407-0700

FAX: (312) 407-0411

www.skadden.com

DIRECT DIAL
312-407-0522
EMAIL ADDRESS
EDWARD.CRANE@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT
PRIVILEGED AND CONFIDENTIAL

July 6, 2012

*Via Federal Express*
Michael I. Fistel, Jr.
Holzer Holzer & Fistel LLC
200 Ashford Center North
Suite 300
Atlanta, GA 30338

Re: *Shareholder Demand Letter*

Dear Mr. Fistel:

We have reviewed your letters dated May 15, 2012, and June 29, 2012, which were sent on behalf of your client, Gregory Alex (the "Letter"). On the Board's behalf, we thank you for your letters.

At this time, CEC's board continues to believe that an investigation regarding the issues raised in your letters would be premature. As you are aware, several legal actions pending against the Company assert allegations similar to the concerns raised in your initial letter. Motions to dismiss in those actions have either been fully briefed, or will be by mid-August, and it is our expectation that at least one ruling on the motions will issue next month.

The Board continues to believe it is appropriate to defer the investigation requested in your letter while the aforementioned actions are pending, in part because decisions in these actions could determine to what extent an investigation might be necessary. However, the Board has not ruled out the possibility of an investigation at a later date. As previously stated in my June 13, 2012 letter, the Board will continue to monitor these cases and advise you promptly of its ultimate determination at an appropriate time in the future.

Very truly yours,

Edward M. Crane
KS

Edward M. Crane

cc:     CEC's Board of Directors
        Jeffrey D. Ayers

# Exhibit E

DIRECT DIAL
312-407-0572
DIRECT FAX
312-407-0411
EMAIL ADDRESS
CHAKA.PATTERSON@SKADDEN.COM

September 17, 2012

*__Via Email__*

Mr. Michael I. Fistel, Jr.
Holzer, Holzer & Fistel LLC
200 Ashford Center North
Suite 300
Atlanta, GA 30338

RE:     Filings in Cook v. McCollugh

Dear Mr. Fistel:

Enclosed please find documents recently filed in *Cook v. McCollugh*, in which the Career Education Corporation ("CEC") Board has passed resolutions to form a Special Litigation Committee ("SLC") of the Board specifically to investigate the issues raised in your Demand Letters dated May 15, 2012 and June 29, 2012. Thank you.

Sincerely,

*Chaka Patterson*

Chaka Patterson

Enclosure

# Exhibit F

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMY COOK, derivatively on behalf of CAREER EDUCATION CORP., | | |
| Plaintiff, | | |
| v. | | |
| GARY E. MCCULLOUGH, STEVEN H. LESNIK, LESLIE T. THORNTON, DENNIS H. CHOOKASZIAN, DAVID W. DEVONSHIRE, PATRICK W. GROSS, GREGORY L. JACKSON, MICHAEL J. GRAHAM, THOMAS B. LALLY, BRIAN R. WILLIAMS, THOMAS G. BUDLONG, and THOMAS A. MCNAMARA, | | Case No. 1:11 cv 9119 Judge John W. Darrah |
| Defendants | | |
| -and- | | |
| CAREER EDUCATION CORP., a Delaware corporation, | | |
| Nominal Defendant. | | |

**DEFENDANTS' SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF MOTION TO STAY**

Nominal defendant Career Education Corporation ("CEC") and Defendants Gary E. McCullough, Steven H. Lesnick, Leslie T. Thornton, Dennis H. Chookaszian, David W. Devonshire, Patrick W. Gross, Gregory L. Jackson, Michael J. Graham, Thomas B. Lally, Brian R. Williams, Thomas G. Budlong and Thomas A. McNamara (collectively, with CEC, the "Defendants") submit this Supplemental Memorandum in Support of their Motion to Stay. Defendants respectfully apprise the Court of a further basis confirming the propriety of a stay of this shareholder derivative action (the "Action"). CEC's Board of Directors (the "Board") has

resolved to appoint two new, independent, and disinterested directors who, once elected, will constitute an independent Special Litigation Committee ("SLC") charged with the responsibility to fully investigate and address the issues raised in this Action.[1] (*See* Resolutions Adopted by the Board of Directors of Career Education Corporation; Resolutions Adopted by the Nominating and Governance Committee of the Board of Directors of Career Education Corporation, Ex. A.) A stay will allow the SLC to fulfill its mandate and determine the outcome of this Action, consistent with the SLC's duties under Delaware law. As important, a stay now will avoid the potential for a needless waste of CEC's resources while the SLC undertakes its investigation of the claims raised herein.

These actions are an additional, and separate, basis for the Court's grant of a stay. As such, they supplement those reasons previously set forth in Defendants' Motion to Stay, which addresses the conflict and other issues occasioned by the pending securities class action, *Ross v. Career Education Corporation*, No. 12-CV-00276 (N.D. Ill.) ("*Ross* Securities Class Action").[2] (ECF Nos. 38, 39.)

## I.    Additional Procedural Background

On September 3, 2012, CEC's Board of Directors resolved that its Nominating and Governance Committee (the "Committee"), immediately institute a search for two additional, independent, and disinterested Board members. (*See* Ex. A.) The Board further resolved that, upon their election, in addition to their other Board duties, these new Board members will be appointed to an SLC, charged with the responsibility of investigating and taking any appropriate action regarding the allegations set forth in this Action. (*Id.*) In conjunction with this

---

[1]    The SLC will similarly address the parallel claims asserted in *Bangari v. Lesnik*, No. 11 CH 41973 (Ill. Ch. Ct.) ("*Bangari* Derivative Action"), which is currently stayed by order of the court. (ECF 39-1.)

[2]    This Supplemental Memorandum incorporates the facts and procedural background provided in Defendants' Motion to Stay and Memorandum in Support, filed on August 29, 2012. (ECF Nos. 38, 39.)

undertaking, the Committee – and the Board – relied upon the Court's Memorandum Opinion and Order denying Defendants' motions to dismiss for failure to make a demand on the Board, including its finding that Plaintiff had "established a basis to excuse her lack of a pre-suit demand of Defendants, pursuant to Fed. R. Civ. P. 23(b)(3)." *See Cook*, Mem Op. and Order 18, ECF No. 35; *see also* Order, *Bangari v. Lesnik*, No. 11 CH 41973, at 1 (Ill. Ch. Ct.) (Order dated Aug. 28, 2012) (ECF No. 39-1). CEC's Board and the Committee will act as swiftly as possible to fulfill their obligations with regard to electing two additional, independent and disinterested directors and forming an SLC, but not so hastily so as to undermine the credibility and independence of the SLC or its process. (*See* Ex. A.)

## II.   This Action Should Be Stayed Pending the SLC's Investigation and Determinations.

Because CEC is a Delaware corporation, the Court should follow Delaware law as it presides over this Action. *See, e.g., Burks v. Lasker*, 441 U.S. 471, 486 (1979) (holding that "federal courts should apply state law governing the authority of independent directors"); *Mills v. Esmark, Inc.*, 573 F. Supp. 169, 171 (N.D. Ill. 1983) (authority of disinterested directors "a matter properly resolved with reference to the applicable state law." (citing *Burks*, 441 U.S. at 480)). So too, Delaware law applies to the issue of whether this Action should be stayed pending the SLC's formation and action. *See, e.g., In re Take-Two Interactive Software, Inc. Derivative Litig.*, No. 1:06 Civ. 05279(LTS), 2007 WL 1875660, at *1 (S.D.N.Y. June 29, 2007) (holding that "the propriety of the SLC's requested stay is a question to be resolved under the law of [company]'s state of incorporation . . . .").

As explained below, staying this Action pending the formation of the SLC and the SLC's investigation is consistent with the decisions of numerous federal and Delaware courts that have granted a stay in the face of an SLC, even after denying a motion to dismiss for failure to plead demand futility. It would also prevent the unnecessary burdensome and duplicative expenditure

3

of CEC's resources in engaging in discovery in this Action, while at the same time providing an independent SLC and its counsel with relevant documents and access to CEC's directors, management and employees.

### A. Delaware Law Consistently Holds that Derivative Actions Should Be Stayed Pending the Investigation and Recommendations of a SLC.

It is hornbook Delaware law that "[t]he right to control the prosecution of litigation belongs in the first instance to the Board of Directors." *Allison v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1112 (D. Del. 1985), *aff'd*, 782 F.2d 1026 (3d Cir. 1985). However, a company's board may delegate to the special litigation committee the authority to address litigation, including derivative suits. *See Zapata Corp. v. Maldonado*, 430 A.2d 779, 785 (Del. 1981); Del. Code Ann. tit. 8, § 141(c)(1) (providing that a company's board may delegate to a committee "all the powers and authority of the board of directors in the management of the business and affairs of the corporation . . . ."). Once a company's board elects to appoint a special litigation committee, that committee's right to investigate the issues at hand "take[s] priority over any entitlement of the [derivative] plaintiff to go forward with the pending action." *Abbey v. Computer & Commc'ns Tech. Corp.*, 457 A.2d 368, 376 (Del. Ch. 1983). The special litigation committee's right to investigate exists in both demand-refused and demand-excused cases. *See, e.g.*, *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000) ("The thrust of *Zapata* is that in either the demand-refused or the demand-excused case, the board still retains its Section 141(a) managerial authority to make decisions regarding corporate litigation.").

Under Delaware law, "a properly formed special litigation committee of the board of directors is generally entitled to a stay of derivative litigation for the reasonable period of time necessary to complete its investigation." *St. Clair Shores Gen. Emp. Ret. Sys. v. Eibeler*, 06 Civ.

4

688 (SWK), 2006 U.S. Dist. LEXIS 72316, at *5-6 (S.D.N.Y. Oct. 4, 2006). Indeed, Delaware

chancery courts "acknowledge [their] duty to stay derivative actions at the instance of a special

litigation committee." *In re Oracle Corp. Derivative Litig.*, 808 A.2d 1206, 1211, 1216 (Del.

Ch. 2002) (granting a motion to stay pending special litigation committee's investigation and

findings after defendant filed an answer). As the *Oracle* court explained:

> When a special litigation committee is empowered to decide
> whether and in what manner a derivative suit should proceed, "the
> Zapata procedure takes the case away from the [derivative]
> plaintiff, [and] turns his allegations over to special agents
> appointed on behalf of the corporation for the purpose of making
> an informal, internal investigation of his charges . . . ."

*Id.* at 1210 (quoting *Kaplan v. Wyatt*, 484 A.2d 501, 509 (Del.Ch. 1984), *aff'd*, 499 A.2d 1184

(Del. 1985)).

The right of CEC's Board to "control the prosecution of litigation" via its SLC exists

even in the face of the Court's denial of Defendants' Motions to Dismiss. *See Allison*, 604 F.

Supp. at 1112; *In re InfoUSA, Inc. Shareholders Litig.*, Civil Action No. 1956-CC, 2008 WL

762482, at *2-3 (Del. Ch. Mar. 17, 2008). Indeed, Delaware courts typically stay derivative

actions when, as here, a company elects to form a special litigation committee after a motion to

dismiss for failure to plead demand futility has been denied. *See, e.g., In re InfoUSA*, 2008 WL

762482, at *2-3; *Katell v. Morgan Stanley Group, Inc.*, CIV. A. No. 12343, 1993 WL 390525, at

*3-4 (Del. Ch. Sept. 27, 1993) (in the wake of a denial of a motion to dismiss, court stayed a

derivative action, holding that it was premature to question SLC's independence prior to the SLC

making its recommendations); *see also In re Gen. Instrument Corp. Sec. Litig.*, 23 F. Supp. 2d

867, 873 n.6 (N.D. Ill. 1998) ("Of course, a finding of demand futility does not preclude the

corporation from subsequently appointing a disinterested litigation committee to assess the

merits of going forward with the litigation." (citing *Zapata*, 430 A.2d at 7868; Del. C. § 141(c)(1).)).

For example, in *In re InfoUSA*, the court found the plaintiffs' derivative complaint, alleging that the defendant directors breached their fiduciary duties and committed waste, sufficient to withstand a motion to dismiss. 2008 WL 762482, at *1. More than four months after that ruling, the company's board created a special litigation committee to investigate the facts alleged in the derivative complaint and those gleaned from an informal SEC investigation. *Id.* The plaintiffs opposed the defendants' request for a stay, arguing that the board's decision to create the committee was "'too late'" and that the authorizing resolution did not provide the committee with sufficient power. *Id.* Rejecting these arguments and granting a 150-day stay, the court held that "[t]he fact that I have already determined demand is excused demonstrates why the board *must* act by means of a committee; it does not in any way explain why it cannot act through an SLC." *Id* at *2 (emphasis original). The court further found that the authorizing resolution provided the committee with sufficient power as it vested the committee with full investigative authority as well as the power to decide how to proceed going forward. *Id.*

The same reasons that supported a stay in *In re InfoUSA* exist in this Action. First, it is not "'too late'" to grant a stay here as discovery has not yet begun and Plaintiff cannot complain that she has expended resources reviewing documents or taking depositions. Indeed, the court in *In re InfoUSA* did not find it "'too late'" to grant a stay even though discovery had in fact begun in that case. *Id.* at *1-2 ("Since [the court's denial of the motion to dismiss], the vast leviathan of discovery in cases such as these has sprung to life, and the quibbles and disputes attendant to such a process have likewise arisen."). Second, the authorizing resolution here, as in *In re InfoUSA*, anticipates an SLC with "the 'full and exclusive authority' to investigate the

pending claims and to 'determine' what course of action the Company should take." *Id.* at *2; (*see also* Resolution at 1.)

The CEC Board's good faith decisions to elect independent and disinterested directors and form a SLC for the purpose of investigating Plaintiff's allegations should be afforded the same deference that federal courts and Delaware courts routinely give to special litigation committees commissioned to carry out their statutorily-imposed duties. The Court should stay this Action while the SLC is formed and completes its work. *See, e.g., Oracle*, 808 A.2d at 1210-11.

### B. Staying This Action Will Avoid the Needless Waste of CEC's Resources.

Staying this action will prevent CEC from expending tremendous financial resources and human capital in complying with discovery in this Action, while at the same time responding to the requests of the SLC. Plaintiff believes discovery will take between 12 to 18 months. (*See* Joint Report 5, ECF No. 41.) It often takes special litigation committees between "six and ten months to investigate and report on pending derivative actions." *Silverstein v. Larson*, No. Civ. 04-3450 ADM/AJB, Civ. 04-3451 ADM/AJB, 2005 WL 435241, at *3 (D. Minn. Feb. 25, 2005) (granting nearly a six month stay and recognizing that it can take up to eight months "to conduct a thorough and independent investigation"); *Charal Inv. Co. v. Rockefeller*, Civ. A. No. 14397, 1995 WL 684869, at *1, *5 n. 2 (Del. Ch. Nov. 7, 1995) (suggesting that it would take a special committee ten months to complete its investigation and report). Here, the Board anticipates that the SLC will be formed and the investigation completed within similarly appropriate time frames. (*See* Ex. A.)

If CEC is forced to engage in discovery in this Action, its resources may be diverted from the SLC, potentially hindering and needlessly complicating that investigation. Directors, officers, and employees forced to comply with document and deposition requests from Plaintiff

as the SLC conducts its investigation, will strain CEC's resources as it simultaneously attempts to conduct its ongoing business operations. Addressing this very tension, the court in *Abbey v. Computer & Communications Technology Corporation*, held:

> *It would likewise seem reasonable to hold normal discovery and other matters in abeyance during this interval.* If a derivative plaintiff were to be permitted to depose corporate officers and directors and to demand the production of corporate documents, etc. at the same time that a duly authorized litigation committee was investigating whether or not it would be in the best interests of the corporation to permit the suit to go forward, the very justification for the creating of the litigation committee in the first place might well be subverted. Likewise, in effect, it would likely amount to simultaneous discovery of the same persons and materials by two separate sources, both allegedly acting on behalf of the corporation.

457 A.2d at 375 (emphasis added). For these same reasons, proceeding with this Action during the SLC's formation and investigation, and before the SLC makes its determinations, is not in the best interests of CEC or its shareholders.

## III.  Conclusion

For the additional reasons set forth above, in the alternative to the relief requested in Defendants' Motion to Stay pending disposition of the *Ross* Securities Class Action, this Court should stay this Action pending the formation of and investigation by CEC's SLC because: 1) Delaware law provides that SLCs like CEC's should be able to investigate without the interference of discovery by a derivative plaintiff; and 2) complying with Plaintiff's discovery would be a needless waste of CEC's resources.

Dated: September 3, 2012

Respectfully submitted,

By: */s/ Lee Ann Russo*
Lee Ann Russo
Daniel E. Reidy

JONES DAY
77 W. Wacker
Chicago, Ill. 60601-1692
312.782.3939

*Counsel for Nominal Defendant*
*Career Education Corporation*

By: */s/ Mary Ellen Hennessy*
Mary Ellen Hennessy
Blake M. Mills
Jessica R. Price

KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661


William M. Regan

KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022

*Counsel for the Individual Defendants*

# Exhibit G

Exhibit A

**RESOLUTIONS ADOPTED BY THE**
**BOARD OF DIRECTORS OF**
**CAREER EDUCATION CORPORATION**
**September 3, 2012**

Upon motion duly made and seconded, the following resolutions were adopted by the Board of Directors (the "Board") without dissent:

**WHEREAS**, the Board has been fully apprised of the court decisions (the "Decisions") denying the motions to dismiss filed in *Cook v. McCullough*, No. 11 CV 09119 (N.D. Ill.), and *Bangari v. Lesnik*, No. 11 CH 41973 (Ill. Ch. Ct.) (the "Litigation"); and

**WHEREAS**, in furtherance of its fiduciary duties and corporate governance responsibilities, the Board believes that it would be advisable and in the best interests of the Company and its stockholders to conduct a thorough and independent investigation into the allegations raised in the Litigation; and

**WHEREAS**, the Board believes that the establishment of a special litigation committee of the Board, comprised solely of independent and disinterested directors, would be advisable for purposes of ensuring the independence of the investigation; and

**WHEREAS**, in light of the Decisions and the Board's interest in expanding the Board to obtain a broader array of skills and backgrounds on the Board, the Board recognizes that it is advisable to identify two additional, independent, and disinterested directors qualified to become members of the Board, consistent with criteria approved by the Board, and to serve as members of a special litigation committee; and

**WHEREAS**, the Charter of the Nominating and Governance Committee (the "Committee") provides that the Committee shall evaluate the size and structure of the Board and evaluate, propose and approve nominees for election to the Board;

**NOW, THEREFORE, BE IT RESOLVED**, that the Board hereby recommends to the Committee that, by October 31, 2012, the Committee recommend to the Board two director nominees, who, upon election as directors, would also be designated by the Board to serve as a Special Litigation Committee of the Board (the "SLC") in connection with the Litigation;

**FURTHER RESOLVED**, that it is anticipated that the SLC shall be delegated the full and exclusive authority and power to conduct such inquiries as it deems necessary and appropriate with respect to allegations asserted in the Litigation and any subsequent related claims and, based on the results of its inquiries, take any and all actions as the SLC deems appropriate and in the best interests of the Company regarding what, if any, actions the Company should undertake with respect to the findings of the SLC; and

**FURTHER RESOLVED**, that, to assist the Committee in making its recommendations and to assist in the prompt action of the Committee, it is authorized to engage expert advisors, including a director search firm, the fees and expenses of which shall be borne by the Company.

# RESOLUTIONS ADOPTED BY THE
## NOMINATING AND GOVERNANCE COMMITTEE OF THE
## BOARD OF DIRECTORS OF
## CAREER EDUCATION CORPORATION

### September 3, 2012

Upon motion duly made and seconded, the following resolutions were adopted by the Nominating and Governance Committee (the "Committee") of the Board of Directors (the "Board") without dissent:

**WHEREAS**, the Board has been fully apprised of the court decisions (the "Decisions") denying the motions to dismiss filed in *Cook v. McCullough*, No. 11 CV 09119 (N.D. Ill.), and *Bangari v. Lesnik*, No. 11 CH 41973 (Ill. Ch. Ct.) (the "Litigation"); and

**WHEREAS**, in furtherance of its fiduciary duties and corporate governance responsibilities, the Board believes that it would be advisable and in the best interests of the Company and its stockholders to conduct a thorough and independent investigation into the allegations raised in the Litigation, and has so advised the Committee; and

**WHEREAS**, the Board believes that the establishment of a special litigation committee of the Board, comprised solely of independent and disinterested directors, would be advisable for purposes of ensuring the independence of the investigation, and has so advised the Committee; and

**WHEREAS**, in light of the Decisions and the Board's recommendation to expand the Board to obtain a broader array of skills and backgrounds on the Board, the Committee believes that it is advisable to identify two additional, independent, and disinterested directors qualified to become members of the Board, consistent with criteria approved by the Board, and to serve as members of a special litigation committee;

**NOW, THEREFORE, BE IT RESOLVED**, that the Committee will recommend to the Board by October 31, 2012, two director nominees, who, upon election as directors, would also be designated by the Board to serve as a Special Litigation Committee of the Board (the "SLC") in connection with the Litigation; and

**FURTHER RESOLVED**, that it is anticipated that the SLC shall be delegated the full and exclusive authority and power to conduct such inquiries as it deems necessary and appropriate with respect to allegations asserted in the Litigation and any subsequent related claims and, based on the results of its inquiries, take any and all actions as the SLC deems appropriate and in the best interests of the Company regarding what, if any, actions the Company should undertake with respect to the findings of the SLC.

<u>VERIFICATION</u>

I, Gregory Alex, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Violations of the Securities and Exchange Act of 1934, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 11/1/12

GREGORY ALEX